Kurt Abron#K-82005
CSP-Solano
Bldg#21-J-6-U
P.O. Box 4000
Vacaville, Ca 95696-4000



In Pro. Per.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

KURT ABRON

Petitioner

CV 08    2857



-v-

NOTICE OF LODGEMENT OF
EXHIBITS IN SUPPORT OF
PETITIONER'S WRIT OF
HABEAS CORPUS

D.J. SISTO
        Warden

        Petitioner Kurt Abron, submits the following exihibits for
lodgement in support of his Writ for Habeas Corpus. Petitioner
request that this Court take Judicial Notice pursuant to **Federal
Rules of Evidence,** on all exihibits herin attached.

(1.)

**EXHIBITS**

(1.) List of Certificates

(2.) Housing and Employment Opportunities

(3.) Calculation Worksheet

(4.) Transcript of Parole Board Hearing(April 19,2007)


Dated___June 3, 2008___          Signed_/Kurt F. Abron_

                                    Kurt F. Abron

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number K-82005
                          )
KURT ABRON                )
                          )
_____)

CALIFORNIA STATE PRISON, SOLANO

VACAVILLE, CALIFORNIA

APRIL 19, 2007

8:34 A.M.

PANEL PRESENT:

Mr. Archie 'Joe' Biggers, Presiding Commissioner
Mr. Robert Harmon, Deputy Commissioner

OTHERS PRESENT:

Mr. Kurt Abron, Inmate
Mr. Mark Norton, Attorney for Inmate
Ms. Heather Trevisan, Deputy District Attorney
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No       See Review of Hearing
_____ Yes      Transcript Memorandum

**Robert Devon Bell**
**Northern California Court Reporters**

ii

## INDEX

PAGE

Proceedings ........................................ 1

Case Factors ..................................... 12

Pre-Commitment Factors ........................... 30

Post-Commitment Factors .......................... 39

Parole Plans ..................................... 64

Closing Statements ............................... 88

Recess...........................................102

Decision ........................................ 103

Adjournment .....................................114

Transcriber Certification ....................... 115

--oOo--

1

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

3     This is a subsequent parole consideration hearing

4     for Mr. Kurt Abron.

5          **INMATE ABRON:**  Abron, yes.

6          **PRESIDING COMMISSIONER BIGGERS:**  Abron.

7     And that's spelled A-B-R-O-N?

8          **INMATE ABRON:**  Yes.

9          **PRESIDING COMMISSIONER BIGGERS:**  CDC

10    number is K-82005.  Today's date is April the

11    19th, 2007.  The time is 8:34, and we are located

12    at the California State Prison, Solano.  The

13    inmate was received on January the 27th, 1998

14    from San Francisco County.  The life term began

15    on January the 27th, 1998, and the minimum

16    eligible parole date was June the 10th, 2006.

17    Controlling offense for which the inmate has been

18    committed is murder second degree.  Case number

19    is 159989.  And it was one count, and that's a

20    violation of the Penal Code 187.  Inmate received

21    a term of 15 years to life with a minimum

22    eligible parole date of June the 10th, 2004.  Now

23    Mr. Abron, this hearing is being tape recorded.

24    And for the purpose of voice identification, each

25    of us will state our first and last name,

26    spelling our last name.  When it's your turn,

27    after spelling your last name, please give us

1   your CDC number. I will start and move to my

2   left. My name is Archie 'Joe' Biggers,

3   B-I-G-G-E-R-S, and I'm a commissioner with the

4   Board of Parole Hearings.

5        **DEPUTY COMMISSIONER HARMON:** Robert

6   Harmon, H-A-R-M-O-N, deputy commissioner.

7        **INMATE ABRON:** My name is Kurt Abron,

8   A-B-R-O-N.

9        **PRESIDING COMMISSIONER BIGGERS:** CDC

10  number.

11       **INMATE ABRON:** CDC number K-82005.

12       **ATTORNEY NORTON:** Mark Norton,

13  N-O-R-T-O-N, attorney for Mr. --

14       **DEPUTY DISTRICT ATTORNEY TREVISAN:**

15  Heather Trevisan, T-R-E-V-I-S-A-N, San Francisco

16  district attorney's office.

17       **PRESIDING COMMISSIONER BIGGERS:** All

18  right. Thank you very much. Note for the record

19  also that we do a correctional officer present

20  who is here for security purposes only, who will

21  not be participating in the hearing. Before we

22  begin, there should be an ADA statement right in

23  front of you. Would you please read that out

24  loud for us, Mr. Abron.

25       **ATTORNEY NORTON:** Actually, there's not,

26  Commissioner, an ADA statement over here.

27       **INMATE ABRON:** "The Americans with

3

```
1              Disabilities Act, ADA, is a law to
2              help people with disabilities.
3              Disabilities are problems that make
4              it harder for some people to see,
5              hear, breathe, talk, walk, learn,
6              think, work, or take care of
7              themselves than it is for others.
8              Nobody can be kept out of public
9              places or activities because of a
10             disability.  If you have a
11             disability, you have the right to
12             ask for help to get ready for your
13             BPT hearing, get to the hearing,
14             talk, read forms and papers, and
15             understand the hearing process.
16             BPT will look at what you asked for
17             to make sure that you have a
18             disability that is covered by the
19             ADA and that you have asked for the
20             right kind of help.  If you do not
21             get help, or you do not think that
22             you got the kind of help that you
23             need, ask for a BPT 1074 grievance
24             form.  You can also get help to
25             fill it out."
26        PRESIDING COMMISSIONER BIGGERS:  Okay,
27   sir.  And do you understand what you just read?
```

4

1             **INMATE ABRON:**  Yes, I do.

2             **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I

3    see that you signed a BPT form 1073 on October

4    the 20th, 2006, indicating that you have no

5    disabilities that have been identified with the

6    Americans with Disabilities Act; is that correct?

7             **INMATE ABRON:**  Yes, sir.

8             **PRESIDING COMMISSIONER BIGGERS:**  The

9    information is still correct on there?

10            **INMATE ABRON:**  Yes, sir.

11            **PRESIDING COMMISSIONER BIGGERS:**  Okay.

12   Did you have any problems walking over here

13   today, or walking up and down stairs?

14            **INMATE ABRON:**  No, I didn't.

15            **PRESIDING COMMISSIONER BIGGERS:**  Do you

16   -- I see you wear glasses.

17            **INMATE ABRON:**  Reading glasses, yes.

18            **PRESIDING COMMISSIONER BIGGERS:**  Reading

19   glasses.  Okay.  Do you need any other device to

20   assist you with your reading glasses in reading

21   anything?

22            **INMATE ABRON:**  No, I don't.

23            **PRESIDING COMMISSIONER BIGGERS:**  Okay.

24   Did you have any hearing impairments?

25            **INMATE ABRON:**  No, I don't.

26            **PRESIDING COMMISSIONER BIGGERS:**  Have you

27   ever been included in triple CMS or EOP programs?

5

1              **INMATE ABRON:**  No, I haven't.

2              **PRESIDING COMMISSIONER BIGGERS:**  Do you

3    know what those are?

4              **INMATE ABRON:**  The programs where you

5    take the medication.  Yes.

6              **PRESIDING COMMISSIONER BIGGERS:**  Well,

7    they are for people that have mental health

8    issues, that need some psychotropic medication.

9              **INMATE ABRON:**  No, I'm not involved in

10   that.

11             **PRESIDING COMMISSIONER BIGGERS:**  Okay.

12   Have you ever taken any psychotropic medication,

13   either on the streets or here in prison?

14             **INMATE ABRON:**  No, I haven't.

15             **PRESIDING COMMISSIONER BIGGERS:**  How far

16   did you get in school on the streets?

17             **INMATE ABRON:**  On the streets, I got up

18   to the community college level.

19             **PRESIDING COMMISSIONER BIGGERS:**

20   Community college level.

21             **INMATE ABRON:**  Yes.

22             **PRESIDING COMMISSIONER BIGGERS:**  I see

23   that.  San Francisco City College, wasn't it?

24             **INMATE ABRON:**  Yes.

25             **PRESIDING COMMISSIONER BIGGERS:**  Do you

26   suffer from any disability that would prevent you

27   from participating in today's hearing?

6

1              **INMATE ABRON:** No, I don't.

2              **PRESIDING COMMISSIONER BIGGERS:** Okay.

3  At this point I'm going to ask your attorney,

4  Mr. Norton, do you feel that your client's ADA

5  rights have been met, sir?

6              **ATTORNEY NORTON:** I do.

7              **PRESIDING COMMISSIONER BIGGERS:** This

8  hearing is being conducted pursuant to the Penal

9  Code sections 3041 and 3042 and the rules and

10  regulations of the Board of Prison Terms

11  governing parole consideration hearings for life

12  inmates.  The purpose of today's hearing is to

13  once again consider the number and the nature of

14  the crimes you were committed for, your prior

15  criminal and social history, and your behavior

16  and programming since your commitment.  Now, we

17  have had the opportunity to review your central

18  file and your prior transcript, and you will be

19  given the opportunity to correct or clarify the

20  record.  We will reach a decision today and

21  inform you whether or not we find you suitable

22  for parole and the reason for our decision.  If

23  you are found suitable for parole, the length of

24  your confinement will be explained to you.  Now,

25  nothing that happens here today is going to

26  change the findings of the court.  This Panel is

27  not here to retry your case.  This Panel is here

7

1    for the sole purpose of determining your

2    suitability for parole.  Do you understand that,

3    sir?

4          **INMATE ABRON:**  Yes, I do.

5          **PRESIDING COMMISSIONER BIGGERS:**  The

6    hearing is going to be conducted in three phases.

7    I will discuss with you about the crime you were

8    committed for, your prior criminal and social

9    history.  Deputy Commissioner Harmon will then go

10   over your post conviction factors, to include

11   your parole plans.  Then I will come back and

12   talk about any letters of opposition that may be

13   in your file.  Deputy Commissioner Harmon -- let

14   me clarify it.  Deputy Commissioner Harmon will

15   also go through your support letters, as well.

16   Once that is concluded, the commissioner, the

17   district attorney, and your attorney will be

18   given the opportunity to ask you questions.

19   Questions from the district attorney shall be

20   asked through the chair, and you will direct your

21   answers to the Panel.  Next the district

22   attorney, then your attorney, then you, will be

23   given the opportunity to make a final statement

24   regarding your parole suitability.  Your

25   statement should address why you feel you are

26   suitable for parole.  At the conclusion of your

27   statement, the Panel will then recess, clear the

8

1 room, and deliberate. Once the deliberations are
2 complete, the Panel will resume the hearing and
3 announce its decision. Now the California Code
4 of Regulations states that regardless of time
5 served, a life inmate shall be found unsuitable
6 for and denied parole if in the judgment of the
7 Panel the inmate would pose an unreasonable risk
8 of danger to society if released from prison.
9 Now, you have certain rights. Those rights
10 include the right to a timely notice of this
11 hearing, the right to review your central file --
12 and I see that you declined to review your
13 central file on October the 20th of 2006. Why
14 did you do that?

15        **INMATE ABRON:** Declined to review my
16 central file?

17        **PRESIDING COMMISSIONER BIGGERS:** Yes.

18        **INMATE ABRON:** It wasn't anything new in
19 there.

20        **PRESIDING COMMISSIONER BIGGERS:** How do
21 you know?

22        **INMATE ABRON:** Well, my counselor -- I
23 asked my counselor, and she said there hasn't
24 been any additional put in there.

25        **PRESIDING COMMISSIONER BIGGERS:** Well,
26 the problem you have with that, sir, is whenever
27 you get the opportunity to do an Olson review,

9

1  you should do it.  Because a lot of paperwork
2  goes through these institutions.

3           **INMATE ABRON:**  Yes.

4           **PRESIDING COMMISSIONER BIGGERS:**  And
5  anything could have been placed in there without
6  even the counselor knowing about it.  So I would
7  encourage you -- you have the right to refuse.

8           **INMATE ABRON:**  Okay.

9           **PRESIDING COMMISSIONER BIGGERS:**  But I'm
10  just encouraging you to always -- if you don't
11  get a date today, then you need to really look at
12  that.

13           **INMATE ABRON:**  Thank you.

14           **PRESIDING COMMISSIONER BIGGERS:**  Okay.
15  You also have the right to present relevant
16  documents, and I'll be asking for those documents
17  very shortly.  At this point, then, I'm going to
18  ask Mr. Norton, does he feel that your rights
19  have been met?

20           **ATTORNEY NORTON:**  Yes, I do.

21           **PRESIDING COMMISSIONER BIGGERS:**  Okay.
22  Thank you.  You have an additional right to be
23  heard by an impartial Panel.  Do you have any
24  objections to the Panel members, sir?

25           **INMATE ABRON:**  No, I don't.

26           **PRESIDING COMMISSIONER BIGGERS:**  Okay.
27  Mr. Norton?

1        **ATTORNEY NORTON:** No.

2        **PRESIDING COMMISSIONER BIGGERS:** I need

3   to make sure that you understand that you are not

4   required to admit your offense or discuss your

5   offense if you desire not to do so, and this

6   Panel cannot hold that against you. However, the

7   Panel does accept the finding of the court to be

8   true. Do you understand that?

9        **INMATE ABRON:** Yes, I do.

10       **PRESIDING COMMISSIONER BIGGERS:** Okay.

11  I'm going to ask Deputy Commissioner Harmon if

12  any confidential material will be used.

13       **DEPUTY COMMISSIONER HARMON:** It's kind of

14  like a yes and a no. No, we will not be

15  utilizing the file in the sense of anything other

16  than there are partial pictures of the crime

17  scene that were somehow inadvertently placed into

18  the confidential tile. I've ask the DA that they

19  resubmit that, or at least request that they be

20  placed in the central file. There's no reason

21  that counsel can't review those documents if

22  necessary. But no other information will be

23  utilized in today's hearing. Thank you.

24       **PRESIDING COMMISSIONER BIGGERS:** Thank

25  you. I'm going to pass to your attorney, as well

26  as to the district attorney, what I have marked

27  as Exhibit 1, which is -- it's a life prisoner

1 parole consideration hearing checklist to ensure
2 that we are all operating on the same set of
3 documents.

4     **ATTORNEY NORTON:** Yes, I do have these
5 documents. I have initialed and dated.

6     **PRESIDING COMMISSIONER BIGGERS:** Thank
7 you.

8     **DEPUTY DISTRICT ATTORNEY TREVISAN:** Thank
9 you.

10     **PRESIDING COMMISSIONER BIGGERS:** Okay.
11 Let the record reflect that both attorneys have
12 all the documents. Are there any additional
13 documents to be submitted?

14     **ATTORNEY NORTON:** Yes, there are. I
15 don't know if the district attorney got one of
16 these or not. I have an extra for -- and this
17 one is for the Board. It's -- some of this stuff
18 is in the Board packet. But there are other
19 documents in here that Mr. Abron has tagged,
20 because I believe it is relevant information in
21 regard to his version of what happened. So I
22 will pass that to the Panel. And I also give the
23 district attorney -- did you have a copy of that?

24     **DEPUTY DISTRICT ATTORNEY TREVISAN:** No.

25     **PRESIDING COMMISSIONER BIGGERS:** Okay.
26 We will go through that at the appropriate time.

27     **ATTORNEY NORTON:** Thank you very much.

12

```
1           PRESIDING COMMISSIONER BIGGERS:  All
2    right.  Any preliminary objections?
3           ATTORNEY NORTON:  No, there are none.
4           PRESIDING COMMISSIONER BIGGERS:  Okay.
5    Will the inmate be speaking to the Panel?
6           ATTORNEY NORTON:  He will.
7           PRESIDING COMMISSIONER BIGGERS:  Okay.
8    Sir, if you will, will you please raise your
9    right hand.  Do you solemnly swear or affirm that
10   the testimony you give at this hearing will be
11   the truth and nothing but the truth?
12           INMATE ABRON:  Yes, I do.
13           PRESIDING COMMISSIONER BIGGERS:  All
14   right.  Thank you.  I'm going to read into the
15   record from the probation officer's report a
16   summary of the offense.  According to the police
17   reports:
18              "Officers went to 926 Shotwell
19              Street on June the 7th, 1994, at
20              3:30 p.m. and met reportee Ruth
21              Roberson.  Ms. Roberson indicated
22              that she found her tenant, the
23              victim DeLisa Abron -- bloody body.
24              Officers followed Ms. Roberson to
25              the rear bedroom, where the
26              victim's body lay on the foot of
27              the bed.  The victim's body was
```

13

```
1        .    badly misshaped.  Ms. Roberson --
2             Roberson.  I'm sorry.  Excuse me --
3             told officers that the victim died
4             -- did have a violent relationship
5             with her husband, the inmate, and
6             they were often involved in fights
7             and things were broken.  Both
8             resided at the residence.  She also
9             indicated that the inmate was
10            involved in crack cocaine use on
11            occasion.  Ms. Robertson stated
12            that neither the inmate nor the
13            victim were at their job for
14            several days.  Homicide inspectors
15            examined the victim's body and
16            noted that the crime scene
17            reflected that a struggle had
18            occurred.  Blood was found in the
19            bedroom, bathroom, and hallway.
20            The victim's head and face was
21            covered in dried blood and was
22            blotted with a ready pack ice pack,
23            that were room temperature when
24            officers arrived.  The victim's
25            face revealed multiple blunt trauma
26            injuries where she had black eyes,
27            contusions, and bleeding.  The
```

| 1 | medical examiner determined that |
|---|---|
| 2 | the victim died from a massive |
| 3 | blunt trauma injury to her face and |
| 4 | head. There was also a sharp edge |
| 5 | instrument wound to the left -- to |
| 6 | the victim's head. Officers found |
| 7 | two dumbbells in the bedroom, along |
| 8 | with a 10-inch, blood-stained |
| 9 | butcher knife in the bathroom. |
| 10 | Homicide inspectors spoke to Linda |
| 11 | Gaut, a friend of the victim's. |
| 12 | She stated she last spoke to the |
| 13 | victim on Saturday or Sunday |
| 14 | evening at 10:30 p.m., and she |
| 15 | heard the victim arguing with the |
| 16 | inmate. The victim told the |
| 17 | inmate, 'Kurt, leave me alone and |
| 18 | leave. I don't want you here any |
| 19 | more.' Ms. Gaut stated that when |
| 20 | the argument became more agitated |
| 21 | or [inaudible], she suggested that |
| 22 | the victim -- to the victim that |
| 23 | she leave the defendant and go to |
| 24 | Ms. Gaut's home to stay. The |
| 25 | victim replied that she would call |
| 26 | Ms. Gaut back in ten minutes when |
| 27 | she was ready to leave, but the |

15

| 1  | victim never contacted her.                       |
|----|---------------------------------------------------|
| 2  | Ms. Gaut stated she attempted to                  |
| 3  | reach the victim on the weekend,                  |
| 4  | and the following Monday and                      |
| 5  | Tuesday at home and work, but she                 |
| 6  | was unsuccessful in her attempts.                 |
| 7  | Ms. Gaut informed the inspector                   |
| 8  | that the victim had been abused by                |
| 9  | the inmate, and stated that three                 |
| 10 | months prior he had broken her arm                |
| 11 | in a fight. The victim failed to                  |
| 12 | contact the police, since the                     |
| 13 | inmate was still on probation for                 |
| 14 | domestic violence, and she did not                |
| 15 | want the inmate going to prison.                  |
| 16 | Homicide inspectors went to Chopi                 |
| 17 | Community Hospital in San Mateo on                |
| 18 | June the 8th, 1994 and interviewed           |
| 19 | the inmate. He indicated that he                  |
| 20 | was not aware that his wife had                    |
| 21 | died; and he stated he last her saw               |
| 22 | on June the 4th, 1994, on Saturday.          |
| 23 | He further related that he had no                 |
| 24 | knowledge of how she had died.                    |
| 25 | After he was Mirandized, he                       |
| 26 | confessed that he pushed the victim               |
| 27 | and struck her with his fists in a                |

16

1           fight on Saturday or Sunday
2           evening.  He stated the victim was
3           injured but not dead when he left
4           her.  He placed the ready packs
5           around her head and left.  He
6           indicated that he was ill that
7           night and drove around and ended up
8           in San Mateo.  When police stopped
9           him, he was taken to the hospital.
10          He claimed he did not mean to kill
11          the victim."
12  That pretty much what transpired, sir?
13          **INMATE ABRON:**  Yes, sir.
14          **PRESIDING COMMISSIONER BIGGERS:**  Okay.
15  So now you are saying that you did in fact feel
16  that you were responsible for her death?
17          **INMATE ABRON:**  I am responsible for her
18  death, yes.
19          **PRESIDING COMMISSIONER BIGGERS:**  Did you
20  hit her with your fist, or do you hit her with
21  something else.
22          **INMATE ABRON:**  I hit her with my fist.
23          **PRESIDING COMMISSIONER BIGGERS:**  How many
24  times?
25          **INMATE ABRON:**  One time.
26          **PRESIDING COMMISSIONER BIGGERS:**  Just one
27  time?

17

1        **INMATE ABRON:** Yes, one time.

2        **PRESIDING COMMISSIONER BIGGERS:** Okay.

3   And that's when she allegedly fell back and hit
4   her head?

5        **INMATE ABRON:** I struck her on the left
6   side of her face. I was up under in her jaw
7   area. She fell back and collided with the
8   dresser in our bedroom.

9        **PRESIDING COMMISSIONER BIGGERS:** Okay.
10   And so why do you think this transpired?

11       **INMATE ABRON:** Why did it transpire? It
12   was a chain of events that led up to that --

13       **PRESIDING COMMISSIONER BIGGERS:** Why
14   don't you tell me about it.

15       **INMATE ABRON:** Well, we were married for
16   ten years. And we had celebrated our tenth
17   anniversary three days earlier than that. But up
18   until -- for seven years we lived a pretty good
19   life and good marriage. Around the end of
20   seventh year, I entered the drug trade. I
21   started using drugs.

22       **PRESIDING COMMISSIONER BIGGERS:** Were you
23   selling them, as well?

24       **INMATE ABRON:** No. No.

25       **PRESIDING COMMISSIONER BIGGERS:** Just
26   using.

27       **INMATE ABRON:** We both started using

18

1   drugs, and that's when our marriage started to
2   deteriorate. At that time we did have an
3   incident where our marriage with filled with
4   infidelity. I had left my wife a few times
5   because of that, what she had done, but I came
6   back.

7          **PRESIDING COMMISSIONER BIGGERS:** So she
8   was the one that was having an affair at that
9   time.

10         **INMATE ABRON:** Yes, sir.

11         **PRESIDING COMMISSIONER BIGGERS:** Okay. I
12  came back -- I know I shouldn't have, but I came
13  back. We had an incident in 1990 where we were
14  trying to get back together. And I came to visit
15  her one night, and I took her out -- we had
16  dinner and I walked her back up to her apartment,
17  because we weren't living together at that time.
18  And she was telling me this and that -- and
19  actually, I was coming to pick up some of my
20  things, also. When I came, she had made promises
21  to me about these guys, and I really shouldn't
22  have let it get to me like that. But she made a
23  promise to me that she wasn't involved with these
24  guys. Once in the apartment, as I was collecting
25  my things, a guy knocked on the door. So I
26  really became enraged. I was pretty mad, because
27  she had told me that she wasn't involved with

19

1    this guy. And we were just about to get back
2    together. So I had a box in my hand with some
3    things in it. And I had an ashtray -- I took out
4    an ashtray out the top of the box and threw it
5    against the wall. A piece of the ashtray broke
6    off and struck her in the top of the head. That
7    was my prior incident I had with her.

8            **PRESIDING COMMISSIONER BIGGERS:** Well,
9    how did she get her arm broke?

10           **INMATE ABRON:** I didn't break her arm.
11           **PRESIDING COMMISSIONER BIGGERS:** You
12   didn't break her arm? You were arrested for it.
13           **INMATE ABRON:** That's -- that jumps
14   forward a couple years. During this time -- let
15   me get to that. During this time, after my
16   wife's head was cut, I had got injured at work.
17   I was burned over 40 percent of my body. So
18   that's the time when she offered me to come back
19   home to live in the house.

20           **PRESIDING COMMISSIONER BIGGERS:** Okay.
21           **INMATE ABRON:** I took her up on the offer
22   and came home. I nursed myself back to health,
23   because she really wasn't there a lot. Because
24   she used to come and go a lot, stay away for a
25   couple days at a time and come back. As I was
26   getting better, the drug use picked up at that
27   time. All of this is centered around drugs. So

20

1  as we were coming up to this 1994 period when
2  this incident happened, as my wife was coming and
3  going all of the time, she came home one day with
4  an arm injury that does not pertain to me.  In
5  the court, her friend came to testify that she
6  hurt her arm away from the house, not with me.
7  That's why I wasn't charged.

8         **PRESIDING COMMISSIONER BIGGERS:**  But you
9  were arrested for that, were you not?

10        **INMATE ABRON:**  No, sir.  I wasn't.

11        **PRESIDING COMMISSIONER BIGGERS:**  Were you
12  put on probation?

13        **INMATE ABRON:**  My probation was over by
14  then.  It was over by then.  They were aware.  My
15  wife went to the hospital and reported that.  So
16  it wasn't me that was responsible for her arm
17  injury.

18        **PRESIDING COMMISSIONER BIGGERS:**  Were you
19  not arrested at one time for inflicting corporal
20  injury upon a spouse?

21        **INMATE ABRON:**  This is the injury where I
22  threw the ashtray and it struck her.

23        **PRESIDING COMMISSIONER BIGGERS:**  Just for
24  the ashtray.

25        **INMATE ABRON:**  Yes, sir.

26        **PRESIDING COMMISSIONER BIGGERS:**  Okay.
27  But you said you did not break her arm.

1          **INMATE ABRON:**  No, sir.  Never.

2          **PRESIDING COMMISSIONER BIGGERS:**  When all

3   this was going on, and you saw the way it was

4   headed, why didn't you just leave?

5          **INMATE ABRON:**  That's the concern the

6   doctor had.  And I had to look at it -- the prior

7   Commissioner Lawin asked me to look at that, that

8   I should figure out what was wrong.  And as I

9   took these many self-help programs, I decided

10  that, I found out that, it was the drugs.

11         **PRESIDING COMMISSIONER BIGGERS:**  It was

12  the drugs.

13         **INMATE ABRON:**  My wife and I were

14  involved in this drugs.

15         **PRESIDING COMMISSIONER BIGGERS:**  What was

16  your drug of choice?

17         **INMATE ABRON:**  Cocaine.  And these drugs

18  had us -- we were controlling each other, and we

19  had misplaced loyalties.  That's basically what

20  it was.  That's what the program taught me.  I

21  didn't really understand it at the time.

22         **PRESIDING COMMISSIONER BIGGERS:**  Did you

23  at one time tell the police that you thought that

24  your decision making was impaired because you

25  felt you were being poisoned?

26         **INMATE ABRON:**  Well, that's further up

27  upon -- that's a week prior to this incident

22

1    happening.  Yes, I was.  I felt that my --
2         **PRESIDING COMMISSIONER BIGGERS:**  That
3    your wife was poisoning you?
4         **INMATE ABRON:**  Yes, sir.
5         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
6    Did you ever get any proof of that?
7         **INMATE ABRON:**  Yes, I did.
8         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
9    What happened?
10        **INMATE ABRON:**  Well, after this incident
11   occurred on this Saturday, I attempted to make it
12   to the hospital, but I passed out before I made
13   it.
14        **PRESIDING COMMISSIONER BIGGERS:**  Well,
15   there was also some discussion about you felt
16   that you touched some lawn product.
17        **INMATE ABRON:**  Yes.  I had been using
18   garden product.  We both had that week prior,
19   using garden products.
20        **PRESIDING COMMISSIONER BIGGERS:**  Okay.
21   Well, if you were using garden products -- see,
22   I'm a little confused.  On one hand you say that
23   your wife was trying to poison you through the
24   food.
25        **INMATE ABRON:**  Yes.
26        **PRESIDING COMMISSIONER BIGGERS:**  And then
27   another time I'm reading in here where you were

23

1   -- you cut the lawn or something, used some lawn
2   products, some chemicals, and that created a
3   problem for you.

4           **INMATE ABRON:**  Where it turned out to be
5   basically the same products that was ingested in
6   my body.

7           **PRESIDING COMMISSIONER BIGGERS:**  So you
8   think she put the lawn product in your food?

9           **INMATE ABRON:**  Yes, sir.  The doctor
10  determined that I had this happen over a period
11  of time, not in a one-day span.  My levels showed
12  that.  As I stayed in the hospital for a couple
13  weeks, my levels kept increasing, which showed
14  that I was poisoned over a period of time.

15          **PRESIDING COMMISSIONER BIGGERS:**  Okay.
16  Did you ever confront your wife about the fact
17  that you thought she was trying to poison you?

18          **INMATE ABRON:**  No.  That's what led up to
19  this thing.  I didn't know that she was poisoning
20  me, but I had been sick this whole week that this
21  incident happened.  And that was just
22  accumulation of it that day.

23          **ATTORNEY NORTON:**  Commissioner, if I may
24  add, part of the documents that we submitted
25  today --

26          **PRESIDING COMMISSIONER BIGGERS:**  Talks
27  about that.

1      **ATTORNEY NORTON:** Yeah. The first tab on
2  the -- the red tab, talks about the court. The
3  court actually concludes that -- it says, 'well,
4  I think the evidence is essentially
5  uncontroverted that at some point in the course
6  of the evening or sometime thereafter, Mr. Abron
7  suffered from the organophosphate poisoning.'
8      **PRESIDING COMMISSIONER BIGGERS:** Okay.
9      **ATTORNEY NORTON:** Okay. So I just wanted
10 to point that out.
11     **PRESIDING COMMISSIONER BIGGERS:** All
12 right. Yeah, I'll get to that in just a second.
13     **ATTORNEY NORTON:** Thank you, your Honor.
14 Thank you, Commissioner.
15     **PRESIDING COMMISSIONER BIGGERS:** Now, you
16 were on probation for what?
17     **INMATE ABRON:** For the misdemeanor
18 spousal abuse.
19     **PRESIDING COMMISSIONER BIGGERS:** Okay.
20 And I understand that it was extended because you
21 were failing to comply with domestic violence
22 counseling; is that correct?
23     **INMATE ABRON:** No, not to my knowledge.
24 I was sent --
25     **PRESIDING COMMISSIONER BIGGERS:** I'll go
26 back and find where I read that. But I
27 understand -- your probation in 1990 had to be

26

1  didn't you call 911 and have somebody come look
2  at both of you?

3          **INMATE ABRON:**  That's my regret I had
4  about that day.  I didn't.

5          **PRESIDING COMMISSIONER BIGGERS:**  You were
6  more concerned about yourself than you were her?

7          **INMATE ABRON:**  Yes, I was.  At that time
8  I was angry, and I was.  I was concerned about
9  myself more.

10         **PRESIDING COMMISSIONER BIGGERS:**  How much
11 cocaine had you taken prior to this incident
12 taking place?

13         **INMATE ABRON:**  None that day.

14         **PRESIDING COMMISSIONER BIGGERS:**  None
15 that day?  How much had you taken the day before?

16         **INMATE ABRON:**  None that day.

17         **PRESIDING COMMISSIONER BIGGERS:**  When was
18 the last time you had taken cocaine prior --

19         **INMATE ABRON:**  Probably a day before
20 that, a small quantity on that Thursday evening.
21 This happened on a Saturday.  That Thursday
22 evening I consumed a small quantity.

23         **PRESIDING COMMISSIONER BIGGERS:**  So you
24 feel that it was the combination of the lawn
25 product that you feel that your wife had been --
26 and putting it in your food, as well as you
27 indicated that you had touched some of this stuff

1  prior to -- you didn't have gloves on or

2  something of that nature?

3        **INMATE ABRON:**  Not the whole time, no.

4        **PRESIDING COMMISSIONER BIGGERS:**  The

5  whole time.  And you had, you had come in contact

6  with this, and this sort of impaired your

7  decision making.

8        **INMATE ABRON:**  Yes, sir.  What initially

9  -- what actually made me strike my wife is when

10  she struck me in the head with a telephone and

11  made this two-inch deep impression on my head.

12        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

13  How about the knife?  Did you stab her, as well?

14        **INMATE ABRON:**  There's no knife involved

15  in my case, sir.

16        **PRESIDING COMMISSIONER BIGGERS:**  No knife

17  involved in your case.  Okay.  Because I know

18  they did find a ten-inch knife.

19        **INMATE ABRON:**  Was it a ten-inch knife?

20        **PRESIDING COMMISSIONER BIGGERS:**  Yeah.

21  Did she normally keep a knife in her bedroom?

22        **INMATE ABRON:**  No, sir.  It was a box

23  cutter there.  But it wasn't a ten-inch knife.

24  And I didn't -- my wife wasn't stabbed, or she

25  didn't have any puncture wounds on her.  No, sir.

26        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

27        **INMATE ABRON:**  I have the autopsy right

28

1   here.

2   **PRESIDING COMMISSIONER BIGGERS:** I

3   understand. I've got the autopsy, but I wanted

4   to know about this ten-inch knife that was found

5   in the bedroom.

6   **INMATE ABRON:** I don't know anything

7   about a ten-inch knife.

8   **PRESIDING COMMISSIONER BIGGERS:** Okay.

9   Mr. Harmon, do you have any questions on the

10  crime, sir?

11  **DEPUTY COMMISSIONER HARMON:** Not at this

12  point, no. Thank you.

13  **PRESIDING COMMISSIONER BIGGERS:** Okay.

14  At this point, sir, do you have anything else you

15  want to offer about the crime? And I will go and

16  read the information that you provided for us

17  this morning.

18  **INMATE ABRON:** Yes, I would -- I'll

19  comment after you read the --

20  **PRESIDING COMMISSIONER BIGGERS:** Well,

21  you're going to have a chance to comment at the

22  end anyway. But I'm going to go through and go

23  through your priors. But I'm asking you, do you

24  have anything to cover at this point on the crime

25  that I may have missed?

26  **INMATE ABRON:** No, that's basically it.

27  **ATTORNEY NORTON:** Commissioner, if I may.

1   It does -- in the probation officer account that
2   you read into the record, on page three it says
3   that officers found two dumbbells in the bedroom,
4   along with a ten-inch blood-stained butcher knife
5   in the bathroom.

6           **PRESIDING COMMISSIONER BIGGERS:**   Right.

7           **ATTORNEY NORTON:**   So that would be not
8   the bedroom.

9           **PRESIDING COMMISSIONER BIGGERS:**   I mean
10  the bathroom.

11          **ATTORNEY NORTON:**   Thank you.   Okay.

12          **PRESIDING COMMISSIONER BIGGERS:**   Do you
13  recall that your wife normally would keep a
14  ten-inch knife in the bathroom?

15          **INMATE ABRON:**   No, sir.

16          **PRESIDING COMMISSIONER BIGGERS:**   Okay.
17  Okay.   Let's move to your social history at this
18  point.   Now, you're the third of four children
19  born to the union of James and Marie --

20          **INMATE ABRON:**   Yes, I am.

21          **PRESIDING COMMISSIONER BIGGERS:**   --
22  Abron.   Your father died in 1996 while he was
23  incarcerated?

24          **INMATE ABRON:**   No.   He was -- my father
25  has never been incarcerated.

26          **PRESIDING COMMISSIONER BIGGERS:**   Hmm.
27  Okay.   Did he pass away in 1996?

30

1          **INMATE ABRON:** Yes, he did.
2          **PRESIDING COMMISSIONER BIGGERS:** And what
3    did he pass away from?
4          **INMATE ABRON:** Diabetes, and he had a
5    stroke.  In Detroit, Michigan.
6          **PRESIDING COMMISSIONER BIGGERS:** Okay.
7    And your mother is still living?
8          **INMATE ABRON:** My mother right now is day
9    to day, in the same Henry Ford Hospital.  And
10   she's --
11         **PRESIDING COMMISSIONER BIGGERS:** In
12   Detroit?
13         **INMATE ABRON:** Like I say, she's
14   terminal.  She has terminal cancer.  Yes, sir.
15         **PRESIDING COMMISSIONER BIGGERS:** I'm
16   sorry to hear that.  Now, you lived in Detroit,
17   Michigan until 1981?
18         **INMATE ABRON:** Yes, I did.
19         **PRESIDING COMMISSIONER BIGGERS:** I'm
20   looking at this Board report here.
21         **ATTORNEY NORTON:** I'm just curious,
22   Commissioner.  Where did you see -- I'm looking
23   for where it says that his father was
24   incarcerated.
25         **PRESIDING COMMISSIONER BIGGERS:** Look in
26   the personal factors on page three of the 2007
27   report.

31

1    **ATTORNEY NORTON:** Okay. Page three,
2  under personal factors?
3        **PRESIDING COMMISSIONER BIGGERS:** Yeah.
4  "His father, James Abron, died in 1996 while
5  prisoner was incarcerated." I'm sorry.
6        **ATTORNEY NORTON:** Thank you. So it
7  wasn't the father was incarcerated.
8        **PRESIDING COMMISSIONER BIGGERS:** No, the
9  prisoner was incarcerated.
10       **ATTORNEY NORTON:** Thank you.
11       **PRESIDING COMMISSIONER BIGGERS:** Now, you
12  dropped out of high school in the 11th grade and
13  later completed your GED at Highland Park
14  Community College in Detroit?
15       **INMATE ABRON:** Yes, I did.
16       **PRESIDING COMMISSIONER BIGGERS:** And do
17  you have a -- you have an AA degree. Is that in
18  your C file?
19       **INMATE ABRON:** It should be.
20       **PRESIDING COMMISSIONER BIGGERS:** What do
21  you mean, it should be? See, that's what -- you
22  need to make sure. That's why it's important
23  that you review your C file.
24       **INMATE ABRON:** Well, that document has
25  been submitted years ago when I was at Mule
26  Creek. I have seen the document at my 2004
27  hearing.

1           **PRESIDING COMMISSIONER BIGGERS:**  Okay.

2           **INMATE ABRON:**  But I do have a recent

3     document where I'm currently enrolled in school

4     right now, where I'm about to attain another AA

5     degree next month.

6           **PRESIDING COMMISSIONER BIGGERS:**  Okay.

7     And that one's in criminology?

8           **INMATE ABRON:**  Yes, sir.

9           **PRESIDING COMMISSIONER BIGGERS:**  Okay.

10    Now, you married the victim in 1984.

11          **INMATE ABRON:**  1984, yes.

12          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

13    The marriage lasted for ten years and two days,

14    and produced no children.

15          **INMATE ABRON:**  Yes.

16          **PRESIDING COMMISSIONER BIGGERS:**  Now, you

17    were in the military; is that correct?

18          **INMATE ABRON:**  Yes, I was.

19          **PRESIDING COMMISSIONER BIGGERS:**  And that

20    was from 1981 to 1991?

21          **INMATE ABRON:**  '91.  Yes, sir.

22          **PRESIDING COMMISSIONER BIGGERS:**  And you

23    were in infantry.  The infantry in the army?

24          **INMATE ABRON:**  Yes.

25          **PRESIDING COMMISSIONER BIGGERS:**  And you

26    were an E6.  Is that a staff sergeant or a tech

27    sergeant?

33

1          **INMATE ABRON:**  Staff sergeant.

2          **PRESIDING COMMISSIONER BIGGERS:**  Staff

3    sergeant.  Why did you get out?

4          **INMATE ABRON:**  I -- after I was burned,

5    right around the Gulf War -- I was supposed to be

6    deployed to the first Gulf War, but I got burned

7    pretty bad.

8          **PRESIDING COMMISSIONER BIGGERS:**  How did

9    you get burned?

10          **INMATE ABRON:**  At my civilian job.  I

11    used to deliver oxygen.  I worked around oxygen.

12    And it was an accident, and I got burned in the

13    accident.

14          **PRESIDING COMMISSIONER BIGGERS:**  So you

15    were in the army -- how many --

16          **INMATE ABRON:**  I was in the reserves.

17          **PRESIDING COMMISSIONER BIGGERS:**  In the

18    reserves.

19          **INMATE ABRON:**  California Army National

20    Guard.

21          **PRESIDING COMMISSIONER BIGGERS:**  The

22    National Guard.  Okay.  And they were getting

23    ready to activate your unit before you got

24    burned?

25          **INMATE ABRON:**  Yes.

26          **PRESIDING COMMISSIONER BIGGERS:**  And I

27    see here that you experimented with marijuana

1  back in 1970; is that correct?

2      **INMATE ABRON:** Yes, I did.

3      **PRESIDING COMMISSIONER BIGGERS:** Like all
4  kids. But your beverage of choice was beer?

5      **INMATE ABRON:** Yes.

6      **PRESIDING COMMISSIONER BIGGERS:** And on
7  your counselor's report here, it indicated that
8  you deny illicit drug usage and claim you only
9  tried a snort of cocaine one time two days before
10 the event. But then you told me earlier that you
11 all had -- you and your wife had gotten involved
12 with cocaine.

13     **INMATE ABRON:** Well, my drug use -- I
14 masked a lot of my drug use, and it kind of
15 confused me. It was a little more severe than I
16 earlier stated.

17     **PRESIDING COMMISSIONER BIGGERS:** A little
18 bit more severe than what you earlier stated. So
19 when you said that you only tried a snort of
20 cocaine one time two days before the event, that
21 was not true?

22     **INMATE ABRON:** No. No, that was true.
23 That was true.

24     **PRESIDING COMMISSIONER BIGGERS:** But I --
25 wait a minute. You told me earlier that over the
26 last three years of your marriage, two or three
27 years --

35

1     **INMATE ABRON:** Yes, sir.

2     **PRESIDING COMMISSIONER BIGGERS:** -- that

3 you were -- that the both of you were involved

4 with drugs.

5     **INMATE ABRON:** Yes, we were.

6     **PRESIDING COMMISSIONER BIGGERS:** Okay.

7 And the drug of choice was cocaine?

8     **INMATE ABRON:** Yes, it was.

9     **PRESIDING COMMISSIONER BIGGERS:** Okay.

10 But then here I'm asking you that -- it shows me

11 on this, on your Board report here, that you

12 denied using illicit drug usage, and claimed that

13 you only tried a snort of cocaine one time two

14 days before the event.

15     **INMATE ABRON:** In that period -- can I

16 explain?

17     **PRESIDING COMMISSIONER BIGGERS:** Yes,

18 please.

19     **INMATE ABRON:** At that period, from 1993

20 to 1994, I was attempting to get a full-time job

21 at Genentech. I was working there as a temporary

22 employee at that time. For me to obtain

23 employment, I would have to pass a drug test. So

24 my drug use stopped for that year. The day that

25 this crime happened, I was hired the day before.

26     **PRESIDING COMMISSIONER BIGGERS:** That's

27 all well and good. Okay, so -- but at the same

36

1  time --

2         **INMATE ABRON:**  My drug use wasn't in
3  effect at that time.

4         **PRESIDING COMMISSIONER BIGGERS:**  Well,
5  you stopped, but you still had been using it
6  quite substantially prior to the time that you
7  stopped, and then you just used it two days prior
8  to this happening again.

9         **INMATE ABRON:**  I used it two days before
10 the crime happened.  But before then, no.  No, I
11 had stopped, because I was subject to the drug
12 test.

13        **PRESIDING COMMISSIONER BIGGERS:**  You had
14 stopped a year before.

15        **INMATE ABRON:**  Yes.

16        **PRESIDING COMMISSIONER BIGGERS:**  Okay.
17 But prior to that year that you stopped, were you
18 not involved with drugs?

19        **INMATE ABRON:**  Yes, I was.  Heavily
20 involved in drugs.

21        **ATTORNEY NORTON:**  I would concur,
22 Commissioner.  It looks like in the Board report,
23 that's what you indicated.  And I think
24 Mr. Abron's cleared that up, that this is somehow
25 -- wasn't communicated very well, or written
26 down.

27        **PRESIDING COMMISSIONER BIGGERS:**  Thank

37

1    you.  Is there anything else that you want to

2    cover -- that I may have left out in your social

3    history that you'd like to talk about, sir?

4          **INMATE ABRON:**  No.  Basically that's it.

5          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I

6    see that you had no juvenile record.

7          **INMATE ABRON:**  No record at all.  No,

8    sir.

9          **PRESIDING COMMISSIONER BIGGERS:**  Well,

10   you do have -- you do have an adult record where

11   you were arrested for that -- what we've talked

12   about briefly earlier, about inflicting corporal

13   injury upon a spouse.

14         **INMATE ABRON:**  Yes.

15         **PRESIDING COMMISSIONER BIGGERS:**  And you

16   received -- and that happened on April the 28th,

17   1990.  And you got three years of formal

18   probation and thirty  days in county jail; is

19   that correct?

20         **INMATE ABRON:**  Well, the 30 days was

21   suspended.  I stayed in jail for one night.

22         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

23   Is there anything else that I may have left

24   before I ask Deputy Commissioner Harmon to go

25   through your post conviction factors, sir?

26         **INMATE ABRON:**  Well, we skipped through

27   so much, I did not --

38

1          **PRESIDING COMMISSIONER BIGGERS:**  Well,
2   this is your turn to tell us what I may have
3   missed.

4          **INMATE ABRON:**  No, I'll wait for you to
5   get to the doctor's report.  Are you going to
6   cover the doctor's report?  Okay.

7          **PRESIDING COMMISSIONER BIGGERS:**  Post
8   conviction factors will be done by Deputy
9   Commissioner Harmon.

10         **INMATE ABRON:**  Okay.  Thank you.

11         **DEPUTY COMMISSIONER HARMON:**  Thank you.
12  Commissioner, I might suggest we take a break for
13  just a minute and clear the room and get this
14  thing set up.

15         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
16  Let's take about a five-minute break, please.

17                     [Recess]

18         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
19  Let the record reflect that everyone that was in
20  the room when we had a little technical
21  difficulties is now back in the room.  We had to
22  go on break for a little while in order --
23  because the equipment was malfunctioning, and we
24  apologize to the inmate for that.

25         **INMATE ABRON:**  I understand.

26         **PRESIDING COMMISSIONER BIGGERS:**
27  Mr. Abron.  And at this point I'm going to ask

39

1    the deputy commissioner to -- Deputy Commissioner

2    Harmon to go over your post conviction factors.

3    And this is a continuation tape from the one that

4    we previously had placed in the file.

5          **DEPUTY COMMISSIONER HARMON:**  Okay.

6    Mr. Abron, your last hearing was February 24th of

7    '04.  You had a three-year denial.  That was your

8    initial hearing; is that correct?

9          **INMATE ABRON:**  Yes, sir.

10         **DEPUTY COMMISSIONER HARMON:**  You were

11   received at Solano July 13th of '05 from ASP?

12         **INMATE ABRON:**  Yes.

13         **DEPUTY COMMISSIONER HARMON:**

14   Classification score today is a revised 19.  Your

15   custody level is medium A.

16         **INMATE ABRON:**  Yes.

17         **DEPUTY COMMISSIONER HARMON:**  Okay.  Good.

18   We are going to focus primarily on the period of

19   time since your last hearing.  And I'm going to

20   take parts of your counselor's report as

21   reference.  And I'll give you an opportunity to

22   add anything I may leave out.  It does show that

23   from August of '03 to August of '04 you remained

24   at Avenal, medium A custody, in the general

25   population.  You were in -- you had completed 22

26   components, receiving 8 certificates in

27   vocational training.  No academics, no work, no

40

1    group activities, no psychiatric treatment. It
2    says you received eight 128(a)'s for failure to
3    report. From August of '04 to August of '05, it
4    shows that on July 13th of '05 you were
5    transferred to California State Prison, Solano.
6    Custody remained at medium A. You were
7    continuing in vocational office services related
8    technology, receiving above average work reports.
9    It says that you were involved in independent
10   college courses. There was no work, no group
11   activities, no psychiatric treatment, no
12   discipline. Then from August of '05 to August of
13   '06, once again you remained at Solano during the
14   entire period of time, medium A custody. It says
15   that you continued with your assignment in office
16   services related technology, completing all
17   components. You were receiving satisfactory work
18   reports. It says you were participating in FEMA
19   and taking college courses. There's no other
20   work, no psychiatric treatment. You're
21   participating in AA/NA. There's no discipline
22   problems. From August of '06 to December 1st of
23   '06, you remained at CSP Solano during the entire
24   period of time, medium A custody, receiving
25   satisfactory work reports, continuing with FEMA,
26   and continuing with college courses. No other
27   work. You're continuing with the 12-step

41

1    program.  No psychiatric treatment, no

2    discipline.  And this is signed February 7th of

3    '07 by R. Long, L-O-N-G for the transcriber, who

4    is your correctional counselor.  Now that brings

5    us up to February of '07.  Here we are in April.

6    First of all, let me ask you the question:  Did

7    the counselor get most of the information right

8    there?

9         **INMATE ABRON:**  That was -- that was

10   pretty accurate, yes.

11        **DEPUTY COMMISSIONER HARMON:**  Okay.  So

12   from February 7th to where we are today, can you

13   kind of bring us up to date?  Because here we are

14   in mid-April, and I have no addendum to bring us

15   up to date.  So can you tell us where you are

16   currently assigned and what is going on.

17        **INMATE ABRON:**  Since February on that

18   date, I'm still currently in office services.

19   But I'm practicing for my Microsoft Office

20   certifications in Word, Excel, Access, and

21   PowerPoint.  These certifications will allow me

22   to be more employable upon my release.

23        **DEPUTY COMMISSIONER HARMON:**  Okay.

24        **INMATE ABRON:**  It's straight from

25   Microsoft.  They don't have anything to do with

26   the California Department of Corrections.

27        **DEPUTY COMMISSIONER HARMON:**  Okay.  And

42

1    can you tell us what you do with your free time?

2           **INMATE ABRON:**  In my free time, I'm a

3    full-time student at Coastline Community College.

4    I'm 15 units shy of obtaining another associate's

5    degree, which I will complete next month.  I have

6    the transcript right here for you.  That is

7    current.

8           **ATTORNEY NORTON:**  For the record, it

9    looks like an original Coastline Community

10   College transcript, dated -- let's see --

11   February 13th, 2007.

12          **DEPUTY COMMISSIONER HARMON:**  That's fine.

13   You're an officer of the court.  No problem.

14          **ATTORNEY NORTON:**  Thank you.

15          **DEPUTY COMMISSIONER HARMON:**  We'll take

16   that information.

17          **INMATE ABRON:**  I had that in my file.

18   That is supposed to be in my file.  I gave it to

19   them.

20          **DEPUTY COMMISSIONER HARMON:**  There is.

21   There's copies of transcripts in there.  It may

22   not have your most recent courses, but there is.

23          **INMATE ABRON:**  Yes.  This is recently.

24          **DEPUTY COMMISSIONER HARMON:**  Okay.  And

25   can you tell us other things you may do with your

26   free time.  Do you do any independent reading on

27   any other areas, or --

43

1          **INMATE ABRON:**  Well actually, I don't
2    really have time.  I just completed the FEMA
3    26-course - courses too.  I have the completion.
4    That should be in my file, too.  So basically,
5    when I come from office services, I do this and
6    the FEMA, and various self-help groups I'm in.
7    I'm always busy.

8          **DEPUTY COMMISSIONER HARMON:**  Okay.  What
9    self-help groups are you in right now?

10         **INMATE ABRON:**  Actually, I just finished
11   also the seven -- no, the nine courses of
12   Crimanon, which I just finished right then.  And
13   I finished that in January.  And I just got the
14   completion, which should be in the file also, the
15   nine courses.

16         **DEPUTY COMMISSIONER HARMON:**  Okay.

17         **INMATE ABRON:**  The NA, the AA.  But
18   basically these five classes of Coastline really
19   tires me out.

20         **DEPUTY COMMISSIONER HARMON:**  Okay.

21         **INMATE ABRON:**  I take five classes.

22         **DEPUTY COMMISSIONER HARMON:**  Well, good.
23   Good.  You go out in the yard at all?

24         **INMATE ABRON:**  Pardon me?

25         **DEPUTY COMMISSIONER HARMON:**  Do you go
26   out in the yard?

27         **INMATE ABRON:**  Yes, I do.  I run.  I go

1  out for a couple hours and run every day,

2  whenever I can.

3      **DEPUTY COMMISSIONER HARMON:** Okay. Are

4  you a spiritual man?

5      **INMATE ABRON:** Very spiritual. I attend

6  at least one service every week, in the chapel.

7      **DEPUTY COMMISSIONER HARMON:** All right.

8  Okay. That kind of gives us an idea of what you

9  do, then.

10      **INMATE ABRON:** Oh, yes. Yes, sir.

11      **DEPUTY COMMISSIONER HARMON:** Okay. Now,

12  let's go into your history here a little bit. I

13  want to ask you -- the office-related technology

14  program, you've got that down, right?

15      **INMATE ABRON:** Yes, sir.

16      **DEPUTY COMMISSIONER HARMON:** Now, there's

17  indications that you have taken some shoe repair,

18  landscaping, air conditioning, refrigeration,

19  electronics technician -- however, I don't find

20  any certificates of completion in those areas.

21      **INMATE ABRON:** They should all be in my

22  file.

23      **DEPUTY COMMISSIONER HARMON:** That's why

24  the commissioner talked to you earlier about

25  doing your C file review. I'm pretty good about

26  going through those files. I didn't find them.

27  Here's what I did find. I found that you've held

45

1    various jobs since being in the institution.

2    You've been -- I'll take some of them. You've

3    been a groundskeeper, recreation aid, clothing

4    attendant, water -- excuse me, part of the work

5    program. Areas like that, you've maintained good

6    work reports. But as far as vocational

7    completions, do you have those other than office

8    services or office-related technology?

9          **INMATE ABRON:** I have them all, but I

10   didn't bring it with me today. I have completed

11   all of those. Those are all completions.

12         **DEPUTY COMMISSIONER HARMON:** So when did

13   you complete air conditioning? I'll go back

14   through your file again.

15         **INMATE ABRON:** Yes, I completed air

16   conditioning in 2004 at Avenal. That's where I

17   took it at.

18         **DEPUTY COMMISSIONER HARMON:** Okay. And

19   when did you complete --

20         **INMATE ABRON:** The landscape was

21   completed several months before then.

22         **DEPUTY COMMISSIONER HARMON:** And is that

23   in horticulture?

24         **INMATE ABRON:** Yes, sir.

25         **DEPUTY COMMISSIONER HARMON:** And that was

26   in '04 also?

27         **INMATE ABRON:** Yes, sir.

46

1           **DEPUTY COMMISSIONER HARMON:** You
2     completed two vocations in the same year?
3           **INMATE ABRON:** Yes.
4           **DEPUTY COMMISSIONER HARMON:** And what's
5     this electronics technician program? That's
6     what?
7           **INMATE ABRON:** Which one is that?
8           **DEPUTY COMMISSIONER HARMON:** Are you a
9     certified electronic technician, or is that just
10    a job you held?
11          **INMATE ABRON:** Those are just jobs I
12    held.
13          **DEPUTY COMMISSIONER HARMON:** Okay. So I
14    can cross that out. And what's the shoe repair?
15          **INMATE ABRON:** The shoe repair is at
16    Folsom. I completed that. It was a course in
17    repairing shoes, the boots we wear.
18          **DEPUTY COMMISSIONER HARMON:** What year
19    was that?
20          **INMATE ABRON:** And also the staff shoes.
21    That was from 1999 to 2002.
22          **DEPUTY COMMISSIONER HARMON:** Okay. I'm
23    going to have to go back through those. Okay.
24    So you're saying you've completed the
25    office-related technology program.
26          **INMATE ABRON:** Yes.
27          **DEPUTY COMMISSIONER HARMON:** 22 of 22 on

47

1    the certification units. You said you completed
2    air conditioning, refrigeration?
3            **INMATE ABRON:** Yes, I have, with
4    certifications from the EPA. Yes, sir.
5            **DEPUTY COMMISSIONER HARMON:** Okay. And
6    landscaping in '04? Horticulture?
7            **INMATE ABRON:** Yes, sir.
8            **DEPUTY COMMISSIONER HARMON:** Okay. I'll
9    have to check. And the shoe repair. I've gone
10   over your work record. Now, education wise,
11   Pershing High School in Detroit? You went there?
12           **INMATE ABRON:** Yes, sir.
13           **DEPUTY COMMISSIONER HARMON:** But you
14   graduated with a GED?
15           **INMATE ABRON:** I didn't complete it at
16   Pershing, because I have -- became a young
17   father, so I dropped out and got a job, and I got
18   my GED.
19           **DEPUTY COMMISSIONER HARMON:** Okay. You
20   got that in '81, I found.
21           **INMATE ABRON:** Yes.
22           **DEPUTY COMMISSIONER HARMON:** Okay. And
23   then we talked about Coastline and San Francisco
24   City College?
25           **INMATE ABRON:** Yes, sir.
26           **DEPUTY COMMISSIONER HARMON:** Okay. Self
27   help and group -- well, let's take this. I found

1    a TABE score, just to bring it up to date.

2    October of '05 it showed a reading level of 11.8

3    and a total battery of 10.3.  Self-help group

4    programs.  Now, you were part of the -- let's

5    see, Creative Conflict Resolution in '02.

6    Framework for Recovery in '99, Life Plan for

7    Recovery in '98, The Lifers Group, '05.  Anger

8    Management -- that particular program was, you

9    took the Cage Your Rage in '02.

10             **INMATE ABRON:** Yes, sir.

11             **PRESIDING COMMISSIONER BIGGERS:** And you

12   took a substance abuse program, and you were part

13   of the STOP program, Seven Habits of Highly

14   Effective People.  Are you currently

15   participating in 12 step?

16             **INMATE ABRON:** Yes, I am.  I am in the

17   NA/AA program, and I am also enrolled in the 40

18   Days of Purpose program that they have going

19   right now.

20             **DEPUTY COMMISSIONER HARMON:** 40 Days of

21   Purpose.  I'm not familiar with that one.

22             **INMATE ABRON:** Yes, sir.  It's a

23   religious program.

24             **DEPUTY COMMISSIONER HARMON:** Okay.  Did

25   you learn to sell it -- did you learn the 12

26   steps?

27             **INMATE ABRON:** Pretty much.  There's

49

1   three of them that I really apply to myself.

2   One, four, and eight.

3          **DEPUTY COMMISSIONER HARMON:**  Well, okay.

4   Let me ask you, though.  Let me ask you.  Do you

5   know all 12?

6          **INMATE ABRON:**  Yes, I know them.

7          **DEPUTY COMMISSIONER HARMON:**  Okay.  Let

8   me ask you:  What does the tenth step mean to

9   you?

10         **INMATE ABRON:**  Tenth step.  Tenth step I

11  can't recall offhand.

12         **DEPUTY COMMISSIONER HARMON:**  What does

13  the fourth mean to you?

14         **INMATE ABRON:**  The fourth step is what

15  got me here.  I made the fearless searching moral

16  inventory of my life, and that helped me get to

17  where I'm at today, and make me find how this

18  crime was committed and everything about my life.

19         **DEPUTY COMMISSIONER HARMON:**  What have

20  you been able to do with the ninth?

21         **INMATE ABRON:**  The ninth step.  I have a

22  list that -- for people that I can make amends

23  to.  I have been making amends my whole time.

24  And I would like to -- the person I can't make

25  amends to is my wife's family.  I have attempted

26  to, but I haven't been able to do it.  And to try

27  to the way I want to, to mail them a letter

1    directly from here, would probably injure them

2    and probably get my own self in trouble. So

3    that's the person that I haven't done.

4         **DEPUTY COMMISSIONER HARMON:** Let me throw

5    something at you, because it does occur in a lot

6    of counties. I don't know any policies of San

7    Francisco, but a lot of the inmates in the state

8    use the district attorney's office as an

9    intermediary, because the victims of crime may be

10   looking for closure as well. I don't know.

11        **INMATE ABRON:** Yes.

12        **DEPUTY COMMISSIONER HARMON:** But some

13   counties don't do it.

14        **INMATE ABRON:** I did that. I sent them a

15   copy of the letter.

16        **DEPUTY COMMISSIONER HARMON:** Okay. What

17   year --

18        **INMATE ABRON:** I wrote the letter right

19   before my 2004 hearing, but I was unable to get

20   it to them. So I just recently sent the same

21   letter to her office several months ago.

22        **DEPUTY COMMISSIONER HARMON:** Okay.

23        **INMATE ABRON:** With a form -- I tried to

24   send it through the Victims Services in

25   Sacramento, that you guys offer. But I sent it

26   to them, and they sent me a letter back saying

27   that they can't give me an address to send the

1   letter. I didn't want their address, because I

2   know her address. I used to -- I used to

3   basically live at their house, so -- at one time.

4   I knew the address, but I didn't want to send it

5   straight from here. I wanted another party to be

6   involved in this process. Because, you know,

7   people can say anything, that I sent them a

8   threatening letter or anything. So once they

9   sent it back, I thought about it, and I finally

10   sent it to her office.

11        **DEPUTY COMMISSIONER HARMON:** Okay. Never

12   had a 115.

13        **INMATE ABRON:** No, no 115's.

14        **DEPUTY COMMISSIONER HARMON:**

15   Congratulations, that's commendable.

16        **INMATE ABRON:** Thank you.

17        **DEPUTY COMMISSIONER HARMON:** Nine 128's,

18   the last one January 23rd of '04 for failure to

19   report, and that was your class.

20        **INMATE ABRON:** That's the class that I

21   was finished with, and they kept making me go

22   there after I received my completion. So I

23   missed a couple times. I was finished with the

24   class.

25        **DEPUTY COMMISSIONER HARMON:** So how many

26   128's did you get since your last hearing,

27   though?

1      **INMATE ABRON:** I haven't had any. I
2  think those were before my hearing.

3      **DEPUTY COMMISSIONER HARMON:** That was
4  just before the hearing. Did they take that into
5  account at the time? Had it been part of your
6  file?

7      **INMATE ABRON:** I'm sure. Yes, they did.
8      **DEPUTY COMMISSIONER HARMON:** Okay. I can
9  check the transcript. Okay.

10      **INMATE ABRON:** Yes, they did.

11      **DEPUTY COMMISSIONER HARMON:** Okay. How
12  about any other accomplishments? Have I missed
13  anything? And by the way, I do appreciate you --
14  this is nicely done, your document that you have
15  submitted today. My records are pretty close to
16  what you've got here. Is there anything that
17  I've missed?

18      **INMATE ABRON:** No, that's everything on
19  there.

20      **DEPUTY COMMISSIONER HARMON:** Okay.

21      **INMATE ABRON:** That's everything. I'll
22  start Sacramento State University in late July.
23  I'll start my new program.

24      **DEPUTY COMMISSIONER HARMON:** Good. I'm
25  going to go on to your doctor's reports.

26      **INMATE ABRON:** Okay.

27      **DEPUTY COMMISSIONER HARMON:** Now, before

53

1    I do, if you remember, the commissioner here has

2    asked me to do post conviction factors.  That's

3    everything since the day you arrived in prison to

4    where we are today.

5         **INMATE ABRON:**  Yes, sir.

6         **DEPUTY COMMISSIONER HARMON:**  So my first

7    question to you is, do you believe you still pose

8    a risk to the safety of the people outside of the

9    prison walls today?

10        **INMATE ABRON:**  No, sir.  I don't.

11        **DEPUTY COMMISSIONER HARMON:**  What do you

12   believe makes you a different man today than the

13   man that came into prison for the life crime?

14        **INMATE ABRON:**  The man back there in 1994

15   had many problems.  I had low self esteem, I was

16   - actually, I was trying to impress a woman that

17   couldn't be impressed.  That was my problem,

18   which led to the drug problem.  So all those

19   factors are out of my life now.  Unfortunately,

20   the drugs came as a result of me trying to get

21   closer with her.  Because she was involved in

22   them, and I wanted to -- she suggested that.  And

23   I was in and out of it, but I got in too far at

24   some point.  And that's what happened.  But I'm

25   not the same person I am right now.  I've

26   learned, I've matured immensely.  I've finally

27   been able to educate myself.  I was going to

54

1   school out there at that time; but with my work
2   and other things, I couldn't go full time like I
3   am going now.  I finally got where I want to be
4   right now.

5           **DEPUTY COMMISSIONER HARMON:**  Okay.

6           **INMATE ABRON:**  My head is clear.  And
7   back there, honestly, I didn't have deterrence
8   back there.  I've never been in trouble aside
9   from that misdemeanor thing, which was big.  I
10  don't want to minimize it.  But I didn't have any
11  deterrence.  I've never been in trouble.  I've
12  never lived a life of crime, any criminal
13  behavior.  So back then, what I was doing, I
14  didn't think I could get in trouble.  But now I
15  have deterrence.  I have made a lot of promises
16  to my family.  And my biggest deterrent is facing
17  this Panel again.  So, no disrespect, though; but
18  I would never, ever want to do that again.

19          **DEPUTY COMMISSIONER HARMON:**  Okay.  Now
20  I'm going to go into your doctor's reports.  Now,
21  what I do is I take parts of the two most recent
22  doctor's reports.  Listen carefully.  I may leave
23  out areas that are very important to you and your
24  attorney.  And I'll try to emphasize the areas
25  that are -- I consider to be important.  The
26  doctor starts out with your history, which has
27  already been done today with you and the

55

```
 1   commissioner.  I will go directly to the area of
 2   -- well, let's say.  John Rouse, R-O-U-S-E, a
 3   forensic psychologist, does this report in
 4   February of '07.  And under substance abuse
 5   history, it says:
 6              "Mr. Abron stated that he
 7              experimented with marijuana and was
 8              a casual user of alcohol, but did
 9              not abuse cocaine -- but did abuse
10              cocaine.  He stated that he had
11              used cocaine two days prior to the
12              instant offense, but had not used
13              any on the day of his life crime."
14   Under clinical assessment, under current mental
15   status and treatment needs, the doctor said here,
16   as to you, on the day of the interview, it says:
17              "He was cooperative and respectful.
18              He spoke in a clear and organized
19              manner.  On the date of this
20              evaluation, Mr. Abron was alert and
21              fully oriented in all spheres.  His
22              thinking was clear, organized, and
23              goal directed.  His insight and
24              judgment seemed within normal
25              limits.  Records do not indicate a
26              mental disorder."
27   Under diagnosis, under axis one, cocaine abuse.
```

56

```
1   And then the writes in parentheses, here, "in
2   institutional remission." Axis two, no diagnosis
3   on axis two. And axis five, a GAF of 90. Under
4   assessment of dangerousness, in part it says:
5           "Mr. Abron has been involved in a
6           number of self-help groups, and
7           appears to have benefited from his
8           participation. He expresses what
9           appears to this examiner to be an
10          appropriate amount of remorse and
11          contriteness for his life crime,
12          but seemed, at least in the opinion
13          of this examiner, to have some
14          limited inside and understanding of
15          the causative factors that
16          precipitated the degree of rage and
17          violence that he committed upon his
18          wife. As a result of that, there
19          is a high reasonable probability
20          that Mr. Abron's risk of
21          dangerousness in this institutional
22          setting is low, but is relatively
23          unpredictable in the wider society,
24          especially as it relates to his
25          involvement in intimate
26          relationships."
27  So that was part of Dr. Rouse's report. The
```

57

1    prior report was from Dr. Silverstein -- for the
2    transcriber, that's S-I-L-V-E-R-S-T-E-I-N -- a
3    licensed psychologist.  That particular report
4    was completed in June of '03.  In that particular
5    report, the doctor does go over your history once
6    again.  I won't do all that again.  But in the
7    area of substance a history, the doctor says in
8    part, "he admitted to a cocaine problem and
9    indicated that he had been using cocaine given to
10   him by a friend during the week of the instant
11   offense."
12   Under current mental status and treatment needs,
13   in part:

14        "The inmate's mental status is
15        negative for clinical disorders.
16        No psychopathology or other mental
17        health treatment or
18        hospitalization.  His thinking was
19        clear, linear, and logical.  The
20        primary clinical issue would be
21        polysubstance abuse.  Apparently,
22        cocaine was a factor in the life
23        crime.  However, there appear to be
24        a myriad of medical issues, in
25        parentheses, poisoning, heart
26        problems, seizure history, et
27        cetera, end of parentheses, which

58

```
 1              have a potential impact on both the
 2              precipitant factors to the crime
 3              and future predictions of
 4              dangerousness."
 5      Under impressions, under axis one, polysubstance
 6      abuse in institutional remission, adjustment
 7      reaction with dysemia, intermittent.  Axis two
 8      deferred, and axis five, a global assessment of
 9      functioning 70.  The doctor does go into the
10      review of the life crime.  It says in part:
11              "There are discrepancies between
12              the inmate's description of the
13              events leading up to and the nature
14              of the crime itself.  He denied any
15              assault on his victim other than
16              striking her and causing her to
17              fall against a corner of furniture,
18              causing a head injury that led to
19              her death.  Police reports
20              apparently indicated that the
21              victim suffered massive blunt
22              trauma injuries to her face and
23              head, and that there was a
24              bloodstained butcher knife in the
25              proximity to the victim when she
26              was found.  The inmate had no
27              explanation for these
```

59

1          discrepancies."
2     In the area of assessment of dangerousness, in
3     part:
4          "The inmate shows regret and
5          remorse for what he did and has
6          some insight into the processes
7          leading up to the instant offense.
8          Overall, I would estimate that his
9          potential for violence in a level
10         two incarceration setting is lower
11         than average.  In the community,
12         his potential for violence is
13         likely -- is near average, assuming
14         one, that he is free of substance
15         abuse; and two, does not return to
16         a high-conflict relationship."
17    And I think at that point, I'll leave Dr.
18    Silverstein's report at that point.  So what I
19    have done there, Mr. Abron, is before I move on
20    to your parole plans, is I have taken parts of
21    the doctor's reports, part of the counselor's
22    reports, and parts of your entire institutional
23    adjustment.  I may have inadvertently left out
24    areas that are important to you and your
25    attorney.  Now, I'm going to go on to your parole
26    plans; but before I do, is there anything that
27    you wish to add to the areas that I covered

60

1  today?

2          **INMATE ABRON:**  Well, just -- I just

3  wanted to clarify the recent medical report from

4  Dr. Rouse.  Dr. Rouse had concerns about -- he

5  asked me a question towards the end of the

6  interview -- and incidentally, that interview was

7  much shorter than the one I had previously -- he

8  had a concern about would I -- he asked me a

9  question, how does he know that I would ever do

10 this again?  And I went in and started to tell

11 him that the core of this problem was the drugs.

12 And the drugs altered my thinking, and the

13 thinking resulted in these actions that happened.

14 He wanted me to explain that to this Panel.  He

15 said I can reserve that and explain it to you

16 guys.

17         **DEPUTY COMMISSIONER HARMON:**  Okay.

18         **INMATE ABRON:**  So what it was, I was

19 trying to explain to him that once we entered

20 that drug culture, that we didn't understand that

21 the -- the far-reaching ramifications in it.

22 Because we had no idea that we would end up

23 turning on each other, and our loyalties would be

24 misplaced, and people from outside can come and

25 control us, as this guy did, came and controlled

26 her.  Which I always wanted to confront him, but

27 I never did.

1          **PRESIDING COMMISSIONER BIGGERS:**   What guy
2    are you talking about, sir?

3          **INMATE ABRON:**   This is just one of the
4    men who supplied the drugs to my wife.   And this
5    is the problems that I never anticipated, other
6    people coming in and dividing our relationship.
7    Although that's what happens in that culture.   I
8    understand that now.   I didn't know it until I
9    received these programs that I have been in.   I
10   found out that the drugs had altered my thinking,
11   and all my decisions and thinking was irrational.
12   My irrational thinking led to the irrational
13   decisions.   So all my actions were wrong.   I
14   understand that now.   I didn't know that before.
15   That's what I didn't understand about the whole,
16   the whole crime.   Commissioner Lawin wanted me to
17   look into that.   And I understand that now, that
18   my thinking was wrong.   So I didn't have anywhere
19   to go but down.

20         **DEPUTY COMMISSIONER HARMON:**   Okay.

21         **INMATE ABRON:**   What happened is, once I
22   had those thoughts in my mind, even though we
23   weren't under the influence of drugs, you still
24   have those thoughts.   You still harbor those
25   resentments that I had from her taunting me with
26   these guys and bringing guys to my home.   Never
27   hit her before, which I wanted to try to explain

62

1  to you guys what made that day different that I
2  did hit her.  That day was different, out of my
3  whole life.  Can I explain that do you, what made
4  that day different?

5        **DEPUTY COMMISSIONER HARMON:**  Well, I
6  mainly want to make sure that you've had an
7  opportunity, you know, to address areas that the
8  doctor, counselor, whatever, left out.  You are
9  getting into an area where it probably be more
10 appropriate under questioning.  I think you are
11 going back into an area that the commissioner is
12 probably going to touch base with you again.

13       **INMATE ABRON:**  Yes.

14       **DEPUTY COMMISSIONER HARMON:**  Because he
15 already started on that, and I won't interfere at
16 this point.

17       **INMATE ABRON:**  He was concerned about the
18 core of my problem.  And I started using the
19 drugs to try to be closer to my wife, but it had
20 the opposite effect.  That's what he wanted to
21 know.

22       **DEPUTY COMMISSIONER HARMON:**  Okay.  How
23 about everything else, though?  Did we cover
24 everything else okay?

25       **INMATE ABRON:**  Yes, sir.

26       **DEPUTY COMMISSIONER HARMON:**  And are you
27 satisfied, counsel?

63

1          **ATTORNEY NORTON:**  Yes, I am.

2          **DEPUTY COMMISSIONER HARMON:**  Okay.  I'll

3    go on to the parole plans.  Now, let's briefly

4    talk here.  You mentioned to your counselor, and

5    you have given me some documents to indicate,

6    that first of all you want to get into some type

7    of transitional housing; is that correct?

8          **INMATE ABRON:**  Yes, sir.

9          **DEPUTY COMMISSIONER HARMON:**  Okay.  And

10   you've supplied documents with places that you

11   can live at.  In fact, we also have a letter from

12   Lynette Safford,  S-A-F-F-O-R-D, that would also

13   provide you with a place to live.

14         **INMATE ABRON:**  Yes.  That's back in

15   Detroit, though.

16         **DEPUTY COMMISSIONER HARMON:**  Right.  And

17   I'm going to go into that in just a second.  But

18   basically you're looking at transitional housing

19   in California.

20         **INMATE ABRON:**  Yes, sir.

21         **DEPUTY COMMISSIONER HARMON:**  Now, is

22   there an actual transitional program that has --

23   that is willing to accept you?

24         **INMATE ABRON:**  Yes, sir.  There's two.

25   Saint Ephraim's House in San Francisco, and the

26   James Marcus [sic] Society would be able to house

27   me for however long as you guys would apply me

64

1  to.

2         **DEPUTY COMMISSIONER HARMON:** Now, did we

3  receive a letter of acceptance, at this point?

4  Either of those?

5         **INMATE ABRON:** They just sent a letter.

6  That letter should be in my file.  I have a copy

7  of one of them.

8         **ATTORNEY NORTON:** Commissioner, it's in

9  my file.  It's in the notices and response

10  section, the first letter under the support

11  letter section from Saint Ephraim's house, signed

12  by Father Nazarene?

13         **INMATE ABRON:** Yes.

14         **DEPUTY COMMISSIONER HARMON:** I'm sorry.

15  I do it.  I did outline it, too.  Okay.  It's

16  handwritten?

17         **ATTORNEY NORTON:** Yes.  That's correct.

18         **INMATE ABRON:** That one is handwritten.

19  Yes, sir.

20         **DEPUTY COMMISSIONER HARMON:** Dated

21  November 10th of '06.

22         **INMATE ABRON:** And another from James

23  Marcus [sic] Society.

24         **DEPUTY COMMISSIONER HARMON:** Okay.  Now,

25  that takes care of California.  Now, you do

26  realize you'll be paroled into California

27  somewhere.

65

1          **INMATE ABRON:**  Yes, sir.

2          **DEPUTY COMMISSIONER HARMON:**  Okay.

3          **INMATE ABRON:**  I'm not worried about

4     going back.  I made that mistake before.  I have

5     to stay here right now.

6          **DEPUTY COMMISSIONER HARMON:**  Okay.  Once

7     you get out on parole, then you can make

8     application to go out of state.  Usually there's

9     some type of transfer agreement, where there's

10    going to be one for one or whatever, from the

11    sending state to the accepting state.

12          **INMATE ABRON:**  I'm not really concerned.

13    I made that mistake in my previous hearing about

14    talking more about Detroit than what is required

15    here.  So I'm going to stick to right here right

16    now.

17          **DEPUTY COMMISSIONER HARMON:**  Okay.  So

18    that takes care of the housing issue.

19          **INMATE ABRON:**  We also have a family

20    home, too.

21          **ATTORNEY NORTON:**  Commissioner, from

22    Mr. -- his brother, James Abron.

23          **DEPUTY COMMISSIONER HARMON:**  Right.

24          **ATTORNEY NORTON:**  Who supports him,

25    housing as well as a job offer as an inspector

26    assistant at his engineering consulting firm.

27    It's dated January 15th, 2007.

66

1        **PRESIDING COMMISSIONER BIGGERS:**  Excuse
2   me, Mr. Harmon.  A couple of things, if I may
3   please, sir.  This James Marcus [sic] Society,
4   did you read what they said on October 31st,
5   2006?  That they would be willing to provide
6   every possible support in quest for your
7   rehabilitation?

8        **INMATE ABRON:**  Yes, sir.

9        **PRESIDING COMMISSIONER BIGGERS:**  What's
10  this about -- I thought you said that they had
11  agreed to take you in.

12       **INMATE ABRON:**  That is the agreement.
13  That's pending verification that you are going to
14  allow me to leave.

15       **PRESIDING COMMISSIONER BIGGERS:**  No, no.
16  Okay.  Let me just go back to the other one, now.
17  At the Saint Ephraim's House, it says, "will be
18  available to you while you seek employment and a
19  permanent residence."

20       **INMATE ABRON:**  Yes, sir.

21       **PRESIDING COMMISSIONER BIGGERS:**  Did they
22  mention how long they were going to allow you to
23  stay there?

24       **INMATE ABRON:**  These two places work
25  together, and they will allow me to stay as long
26  as I have to.

27       **PRESIDING COMMISSIONER BIGGERS:**  Well,

67

1    okay.

2         **INMATE ABRON:** These have been my

3    spiritual advisors through prison, and they also

4    provide me financing for my college education,

5    too.

6         **PRESIDING COMMISSIONER BIGGERS:** And for

7    that you find financial assistance?

8         **INMATE ABRON:** Yes, sir.

9         **PRESIDING COMMISSIONER BIGGERS:** Do you

10   have any proof of that?

11        **INMATE ABRON:** They will -- I started the

12   program in June, in Sacramento State. I haven't

13   -- the papers haven't come through. No, sir.

14        **PRESIDING COMMISSIONER BIGGERS:** Let me

15   just -- if you don't get a date today, let me

16   just clarify something for you. Normally when an

17   inmate comes before a Panel, they will have

18   letters to indicate that they have a place of

19   employment, they have a -- they have a place for

20   you to stay --

21        **INMATE ABRON:** Yes.

22        **PRESIDING COMMISSIONER BIGGERS:** -- upon

23   release.

24        **INMATE ABRON:** Yes.

25        **PRESIDING COMMISSIONER BIGGERS:** They

26   don't say things, that they are going to provide

27   every possible support to you. They don't write

68

1   letters, and handwritten letters saying that will
2   be available to you while you seek employment and
3   a permanent residence.  That infers that you are
4   going to be able to stay with this one, Saint
5   Ephraim's House.

6         **INMATE ABRON:**  Either one.  Yes, sir.

7         **PRESIDING COMMISSIONER BIGGERS:**  No, not
8   either one.  Because if it was, then the Society
9   would have also said the same thing.  So what
10  telling you is that when you get letters of
11  support for either a resident and/or job or
12  whatever, they need to specify that that's what
13  it's for.

14        **INMATE ABRON:**  Okay.

15        **PRESIDING COMMISSIONER BIGGERS:**  Not that
16  they are going to provide every possible support
17  for you.  Yes, sir.

18        **ATTORNEY NORTON:**  Commissioner, I
19  appreciate that.  And I would note that again,
20  having acknowledged what you just said, there is
21  a letter from his brother, James Abron, which
22  specifically addresses --

23        **PRESIDING COMMISSIONER BIGGERS:**  That's
24  entirely different.  I'm only talking about those
25  two halfway houses that Deputy Commissioner
26  Harmon mentioned.

27        **INMATE ABRON:**  I understand.

69

1        **PRESIDING COMMISSIONER BIGGERS:**   Okay.
2    Thank you.

3        **ATTORNEY NORTON:**   Thank you.

4        **PRESIDING COMMISSIONER BIGGERS:**   Thank
5    you, Commissioner Harmon.

6        **DEPUTY COMMISSIONER HARMON:**   That's fine.
7    The housing issue, there's nothing else at this
8    point that I want to go into.  As far as
9    employment, James Abron Jr., your brother, talks
10   about offering you a job with his engineering
11   consulting firm located in Walnut Creek.  And
12   you'd be an entry level inspector at the
13   Consortium Management Company,
14   C-O-N-S-O-R-T-I-U-M for the transcriber.  And you
15   obviously have support in Michigan.  I guess
16   that's where most of your family is, is that
17   right?

18       **INMATE ABRON:**   Yes, all my family are
19   back there now.

20       **DEPUTY COMMISSIONER HARMON:**   And we
21   talked about Lynette's letter.  And then we have
22   -- you and the commissioner briefly touched about
23   the Markunas Society.

24       **INMATE ABRON:**   Yes.

25       **DEPUTY COMMISSIONER HARMON:**
26   M-A-R-K-U-N-A-S, Society, on Post Street in San
27   Francisco.  And that's the one where -- "we have

70

1    continued to be willing to provide every possible

2    support to Kurt in his quest for rehabilitation."

3    In fact, the commissioner, when he brought that

4    up, I have it highlighted also, where I was going

5    to address that with you. And that is something

6    that needs to be clarified. So I just want to

7    make sure that you understand that.

8        **INMATE ABRON:** Yes, I do.

9        **DEPUTY COMMISSIONER HARMON:** Does that

10   pretty well cover your housing and employment

11   plans?

12       **INMATE ABRON:** Yes, it will. You didn't

13   talk about the employment, did you?

14       **DEPUTY COMMISSIONER HARMON:** About

15   employment, your brother.

16       **INMATE ABRON:** Okay. Okay. Okay.

17       **DEPUTY COMMISSIONER HARMON:** Yeah. Yeah.

18   I don't think there's anything else to go into at

19   this point with that. Now, the San Francisco

20   Sheet Metal Workers Union. That was one of my

21   questions.

22       **INMATE ABRON:** Yes.

23       **DEPUTY COMMISSIONER HARMON:** Are you

24   withdrawn from the union there? Do you have a

25   withdrawal card or something, or what?

26       **INMATE ABRON:** No, they invited me to

27   join the union, because I passed the

71

1  certifications in the air conditioner/

2  refrigeration trade.  I had a federal

3  certification, so they invited me to join the

4  union.  I can join the union, but I have to

5  physically be outside of this place to join it.

6      **DEPUTY COMMISSIONER HARMON:**  Do you need

7  some type of certificate of completion or

8  something to give to them?

9      **INMATE ABRON:**  Yes, I have that.  I have

10  that.  Yes, sir.

11      **DEPUTY COMMISSIONER HARMON:**  You have

12  that.  Okay.

13      **INMATE ABRON:**  That's what I sent to

14  them.  That's why they sent me the letter saying

15  I can join.  I sent in my completion from Avenal,

16  and my certification.

17      **DEPUTY COMMISSIONER HARMON:**  Okay.  Okay.

18  The record should also reflect that the

19  appropriate 3042  Penal Code notices have been

20  sent out to the various agencies and individuals

21  in your particular case.  We have a

22  representative here today from the city of San --

23  or the city and county of San Francisco --

24      **DEPUTY DISTRICT ATTORNEY TREVISAN:**  Yes.

25      **DEPUTY COMMISSIONER HARMON:**  -- that will

26  be addressing parole suitability.  I don't have

27  any other letters on file.  I don't have anything

1    that came in late.  I don't -- I don't have
2    anything else at this point to carry on.  Is
3    there any other parole plans that you want to
4    bring forward at this point?
5         **INMATE ABRON:**  No, that was basically it.
6         **ATTORNEY NORTON:**  Actually, if I may,
7    while we are on the subject of parole plans,
8    including in the Board packet.  There is a
9    one-page parole outlook which -- Mr. Abron, days
10   one through five.  Thank you.  You have
11   acknowledged that you have read that.
12        **DEPUTY COMMISSIONER HARMON:**  Oh, yeah.
13   Uh-huh.  I think Life Skills Program and things
14   like that go into it in that.
15        **ATTORNEY NORTON:**  And that he will visit
16   the Parolee Employment Program.
17        **DEPUTY COMMISSIONER HARMON:**  Uh-huh.
18        **ATTORNEY NORTON:**  PEP program.  Thank
19   you.
20        **DEPUTY COMMISSIONER HARMON:**  Thank you.
21   I'll return to the chair.  Thank you.
22        **PRESIDING COMMISSIONER BIGGERS:**  Thank
23   you very much, Deputy Commissioner Harmon.  At
24   this point I'm going to ask the district attorney
25   from San Francisco to -- if she has any questions
26   for the inmate.
27        **DEPUTY DISTRICT ATTORNEY TREVISAN:**  Yes.

73

1    If you could please ask the inmate, he just

2    indicated that he had never hit his wife before,

3    before this incident. This was the first time he

4    hit her. And I'm wondering, just to clarify

5    that, if you could ask him whether he ever used

6    violence against her.

7    **INMATE ABRON:** Well, to answer that

8    question, I've never, I've never struck my wife

9    with my hand. No, I haven't. We have had many

10   heated arguments, verbally.

11    **PRESIDING COMMISSIONER BIGGERS:** You said

12  you never hit her.

13    **INMATE ABRON:** Never hit her.

14    **DEPUTY DISTRICT ATTORNEY TREVISAN:** Okay.

15  During the commission of the crime itself, the

16  life crime, the telephone lines had been cut in

17  the house, and there was a box cutter. Can you

18  ask him whether he recalls doing that.

19    **INMATE ABRON:** On that day the lines were

20  snatched out the wall by her. They weren't cut,

21  they were snatched out the wall. One cord was

22  broke out the wall, snatched out the wall.

23    **DEPUTY DISTRICT ATTORNEY TREVISAN:** How

24  many times had he been arrested for domestic

25  violence?

26    **INMATE ABRON:** Just once.

27    **DEPUTY DISTRICT ATTORNEY TREVISAN:** Was

74

1  he aware of any other police reports indicating
2  domestic violence?

3          **INMATE ABRON:**  No.

4          **DEPUTY DISTRICT ATTORNEY TREVISAN:**  Was
5  he aware of an incident that happened in 1989 in
6  Oakland, where his wife made a report of domestic
7  violence against him?

8          **INMATE ABRON:**  Yes, I am.  My wife made a
9  report that something happened to her.  But once
10  again --

11         **PRESIDING COMMISSIONER BIGGERS:**  Did it
12  involve you, sir?

13         **INMATE ABRON:**  I was at the house, yes.

14         **PRESIDING COMMISSIONER BIGGERS:**  Did it
15  involve you, sir?

16         **INMATE ABRON:**  Yes.  But I wasn't
17  arrested or charged with anything, no.  No.

18         **PRESIDING COMMISSIONER BIGGERS:**  But
19  there was a report filed, is when the question
20  was.

21         **INMATE ABRON:**  I found out there was a
22  report filed at my 2004 hearing, so --

23         **PRESIDING COMMISSIONER BIGGERS:**  So in
24  other words, when you said that you only had one
25  report, and you knew about it in 2004, that's not
26  exactly true.

27         **INMATE ABRON:**  That -- well, excuse me.

75

1  Excuse me.

2      **PRESIDING COMMISSIONER BIGGERS:** Okay.
3  So there was one in '89.

4      **INMATE ABRON:** She did -- I found out
5  that she did file some kind of report on me in
6  1989, yes.

7      **PRESIDING COMMISSIONER BIGGERS:** So you
8  had two.

9      **INMATE ABRON:** Yes, sir.

10     **PRESIDING COMMISSIONER BIGGERS:** Okay.
11 Just clarifying the record, sir.

12     **INMATE ABRON:** Yes.

13     **DEPUTY DISTRICT ATTORNEY TREVISAN:** Do
14 you know whether she filed a report when she had
15 accused you of breaking her arm three months
16 prior to this incident?

17     **INMATE ABRON:** No, she didn't accuse me
18 of breaking her arm prior to this incident.

19     **DEPUTY DISTRICT ATTORNEY TREVISAN:** Could
20 you ask him whether he is aware that his -- she
21 did tell his mother -- her mother and friends
22 that he was responsible for breaking her arm.

23     **INMATE ABRON:** Well, I have heard that in
24 the trial testimony. Yes, sir. And the other
25 girl came and testified that it was indeed not
26 me.

27     **DEPUTY DISTRICT ATTORNEY TREVISAN:** Just

1    to clarify the cocaine use. He indicated that he
2    hadn't used it prior except for a couple days
3    prior to this incident. But when in years was
4    the time -- or the time period where he had the
5    extreme cocaine addiction?

6    **INMATE ABRON:** I probably began around
7    early 1990, and it went into 1993, extensively.

8    **PRESIDING COMMISSIONER BIGGERS:** So your
9    answer is 1990 to 1993?

10    **INMATE ABRON:** Of '90 to '93. Yes, sir.

11    **DEPUTY DISTRICT ATTORNEY TREVISAN:** While
12    he has been in custody, has he sought any
13    treatment for domestic violence?

14    **INMATE ABRON:** Yes, I have. I have taken
15    at least five programs for domestic violence.

16    **DEPUTY DISTRICT ATTORNEY TREVISAN:** Can
17    you clarify what those programs are and their
18    duration?

19    **INMATE ABRON:** The first one, the first
20    program I ever took at Mule Creek, Life Plan for
21    Recovery. Life Without a Crutch was a domestic
22    violence program.

23    **ATTORNEY NORTON:** If I may -- I'm sorry.
24    The Life Plan for Recovery was October 19th,
25    1998.

26    **INMATE ABRON:** Yes. That's the first.
27    **ATTORNEY NORTON:** Life Without a Crutch,

77

1 January 26, 2000.

2 **INMATE ABRON:** This Creative Conflict
3 Resolutions on April 25th, 2002, is a domestic
4 violence.

5 **PRESIDING COMMISSIONER BIGGERS:** That's
6 also Anger Management, isn't it?

7 **INMATE ABRON:** Yes, sir. And followed by
8 the Anger Management Program on July 13th, 2003.
9 I have taken various other programs --

10 **PRESIDING COMMISSIONER BIGGERS:** We will
11 get into that, sir.

12 **INMATE ABRON:** The Crimanon series,
13 dealing with domestic violence.

14 **DEPUTY DISTRICT ATTORNEY TREVISAN:** In
15 the life crime, did he -- where did the one
16 strike that he -- to her face occur? What room
17 of the apartment?

18 **INMATE ABRON:** What room?

19 **DEPUTY DISTRICT ATTORNEY TREVISAN:** Yeah.
20 **INMATE ABRON:** Everything happened in our
21 bedroom.

22 **DEPUTY DISTRICT ATTORNEY TREVISAN:** Did
23 you ever see her after she was injured in the
24 hallway or any of the other rooms?

25 **INMATE ABRON:** No. I was told that
26 something happened, that it was blood in the
27 bathroom, which connects to our bedroom. So

1   evidently she got up and went in the bathroom.

2        **DEPUTY DISTRICT ATTORNEY TREVISAN:**   When

3   he left her, did he leave her on the floor or on

4   the bed?

5        **INMATE ABRON:**   I left her on the bed, on

6   the side of the bed, sitting of the side of the

7   bed.

8        **PRESIDING COMMISSIONER BIGGERS:**   Sitting

9   on the side of the bed?

10       **INMATE ABRON:**   Sitting on the side of the

11  bed, holding an ice pack on her face.

12       **DEPUTY DISTRICT ATTORNEY TREVISAN:**   She

13  was conscious.

14       **INMATE ABRON:**   Yes.

15       **DEPUTY DISTRICT ATTORNEY TREVISAN:**   I

16  don't have any other questions.

17       **PRESIDING COMMISSIONER BIGGERS:**   Okay.

18  Thank you, ma'am.

19       **DEPUTY COMMISSIONER HARMON:**   Excuse me,

20  Commissioner.   Can I ask a question at this

21  point?

22       **PRESIDING COMMISSIONER BIGGERS:**   Sure.

23       **DEPUTY COMMISSIONER HARMON:**   Since this

24  was submitted late, you know, just prior to the

25  hearing, I've had a chance to review this

26  document.   I just have a question here that I'd

27  like to ask you.   I notice that you have

79

1   emphasized a lot of areas by highlighting with a
2   yellow pen.

3          **INMATE ABRON:** Yes, sir.

4          **DEPUTY COMMISSIONER HARMON:** And what it
5   does, when I review this material, it indicates
6   to me that you feel very strongly that there's a
7   lot of mitigation in this crime.

8          **INMATE ABRON:** Well, I just wanted you to
9   really -- neither one of you were at my previous
10  hearing, so I wanted to point out some things to
11  get you a better understanding of how I felt,
12  that my condition that day.

13         **DEPUTY COMMISSIONER HARMON:** I understand
14  that. But the areas that you've highlighted
15  indicates to me that you're not taking or
16  assuming responsibility for this crime.

17         **INMATE ABRON:** No, sir. I accept full
18  responsibility for the crime. It's the method
19  and the way it's been written that it happened.

20         **DEPUTY COMMISSIONER HARMON:** Well, I'll
21  review it during our deliberations. But it's
22  real clear to me that the areas that you've
23  emphasized yourself indicate to me that there
24  were memory gaps, that there's medical
25  conditions, that there's a number of different
26  reasons here -- we are talking amnesia, we are
27  talking about an EEG that was done, and an MRI,

80

1   the fact that it was a sharp force, like a knife.

2          **INMATE ABRON:**  Not like a knife.  It says

3   "not like a knife."

4          **DEPUTY COMMISSIONER HARMON:**  In other

5   words, it is not a sharp force like a knife.

6          **INMATE ABRON:**  Yeah.  It wasn't a knife.

7   Yes, sir.

8          **DEPUTY COMMISSIONER HARMON:**  Yeah.  So

9   anyway, I mean, it goes on and on.  I'll

10  deliberate, but I'm trying to get your -- you

11  talked to the commissioner earlier today about

12  the crime; and now that I review all your

13  documents here -- I've had an opportunity during

14  the hearing to review this -- it just appears to

15  me that you don't take full responsibility for

16  this crime.

17         **INMATE ABRON:**  No, sir.  I take full

18  responsibility for it.  I just don't agree with

19  the way the record is written.

20         **DEPUTY COMMISSIONER HARMON:**  Okay.  I'll

21  return to the chair.  Thank you.

22         **PRESIDING COMMISSIONER BIGGERS:**  Thank

23  you very much.  Now at this point I'm going to

24  ask your attorney, Mr. Norton, does he have any

25  questions for you.

26         **ATTORNEY NORTON:**  I do have a few.  Thank

27  you, Commissioner.  Mr. Abron, you had an

81

1 opportunity to review the February 2004 decision
2 transcript from your first hearing; is that
3 correct?

4      **INMATE ABRON:** Yes, sir.

5      **ATTORNEY NORTON:** And Commissioner Lawin,
6 do you remember what she said, one of the first
7 things she said?

8      **INMATE ABRON:** Lawin. Lawin.

9      **ATTORNEY NORTON:** Lawin. I'm sorry.

10      **INMATE ABRON:** No problem.

11      **ATTORNEY NORTON:** She basically said she
12 did not believe you; is that correct?

13      **INMATE ABRON:** She didn't believe a word
14 I said. Yes, sir.

15      **ATTORNEY NORTON:** Okay. And is that the
16 reason you submitted these documents today, was
17 specifically to answer her concerns at the last
18 hearing?

19      **INMATE ABRON:** Yes, it is. Because I
20 didn't have those documents at that hearing.

21      **ATTORNEY NORTON:** Correct. Would you
22 agree that your marriage to your wife was a
23 highly conflicted relationship?

24      **INMATE ABRON:** The second part of it.
25 Yes, sir.

26      **ATTORNEY NORTON:** The second part meaning
27 years seven through ten?

82

1        **INMATE ABRON:** Yes, sir.

2        **ATTORNEY NORTON:** Okay. And what steps
3    have you taken since this incident to prevent
4    another high-conflict relationship like that
5    existing?

6        **INMATE ABRON:** Basically --

7        **ATTORNEY NORTON:** Take your time.

8        **INMATE ABRON:** I promised myself that I
9    would never involve myself in the drugs that was
10   the core of this whole problem. I've never been
11   in trouble before, and I have based all my
12   thinking back to when I started using these
13   drugs. I have made promises to myself, to my
14   parents. Because no one can realize, why did I
15   do this? It was out of the ordinary. So it had
16   to be something else that was going on in my
17   life. At that time I don't know what was going
18   on with my marriage. But it seemed like it was
19   strained; so I got into these drugs to try to
20   come closer to her, and it just didn't happen. I
21   would never try to attach myself to anyone for
22   any reason ever again, no matter who it is. My
23   wife used to come back and tell me to leave all
24   the time, at one and two o' clock in the morning,
25   and I wouldn't leave. But now if anyone would
26   ask me to leave, I would run away, no matter what
27   time it is.

83

1    **ATTORNEY NORTON:** Okay. Well, Dr. Rouse
2  had specific concern that your risk of
3  dangerousness in the wider society would be
4  unpredictable, especially as it relates to
5  'involvement in intimate relationships.' You
6  read that, correct?

7    **INMATE ABRON:** Yes, sir.

8    **ATTORNEY NORTON:** And what does that mean
9  to you?

10   **INMATE ABRON:** It -- it sounds to me that
11  he's saying I could be involved in another
12  relationship. I don't understand that.

13   **ATTORNEY NORTON:** Okay. Well, do you
14  think that his -- it seems to me he acknowledges
15  that you didn't have any prior criminal history
16  other than the domestic violence, correct?

17   **INMATE ABRON:** Yes, sir.

18   **ATTORNEY NORTON:** Okay. And that your
19  problem -- and that you did serve eight years
20  honorably in the military; is that correct?

21   **INMATE ABRON:** Yes, sir. I did.

22   **ATTORNEY NORTON:** Okay. So would it be
23  safe to say that but -- except for your
24  relationship with your wife, you functioned
25  within society and had normal relationships with
26  other people.

27   **INMATE ABRON:** My entire life. Yes, sir.

84

1          **ATTORNEY NORTON:**  Okay.  So my question
2    is, what have you done specifically to address
3    the problem of repeating another relationship
4    that you had with your wife?

5          **INMATE ABRON:**  Well, I would like really
6    highly -- I would look into the next person very
7    deeply before I would get involved with them.
8    But I would first look into myself.  Is it the
9    right thing for me.  I'm not really interested in
10   any relationships right now.  I'm really ashamed
11   of all this right now, and I have obligation to
12   do other things now.  I wouldn't want to get
13   involved right now.

14         **ATTORNEY NORTON:**  Okay.  Thank you.  And
15   you mentioned too that you started using drugs
16   about seven years into your marriage.  And what
17   was the reason you started using the drugs?

18         **INMATE ABRON:**  Well, our marriage was
19   strained a little bit.  And my wife was dibbling
20   and dabbling in drugs.  I don't want to blame
21   anything on her.  But I did that as a way to get
22   closer to her.

23         **ATTORNEY NORTON:**  And do you recognize
24   now that that was a grave error on your part to
25   do that?

26         **INMATE ABRON:**  Yes, sir.  Yes, I do.
27         **ATTORNEY NORTON:**  Thank you.  And during

85

1  the instant commitment offense, how many times
2  did you physically hit your wife?
3       **INMATE ABRON:**  I struck my wife one time
4  on her lower left jaw.
5       **ATTORNEY NORTON:**  Okay.  And prior to
6  that, had she struck you with anything?
7       **INMATE ABRON:**  Yes, she did.
8       **ATTORNEY NORTON:**  What did she strike you
9  with?
10      **INMATE ABRON:**  Probably five seconds
11 before then, my wife struck me on the top of my
12 head with a very heavy antique phone.
13      **ATTORNEY NORTON:**  And do you still have a
14 scar on your head to this day from that?
15      **INMATE ABRON:**  Yes, I do.  It's a
16 two-inch scar.
17      **ATTORNEY NORTON:**  And you've -- that's --
18 you've always told that version of that story,;
19 is that correct?
20      **INMATE ABRON:**  Yes, sir.  That's what
21 happened.
22      **ATTORNEY NORTON:**  And that is the truth?
23      **INMATE ABRON:**  Yes, sir.
24      **ATTORNEY NORTON:**  And had you hit your
25 wife more than one time, would you -- would you
26 have any reason to deny that?
27      **INMATE ABRON:**  No, I wouldn't.  At this

86

1    time I would gladly tell the Panel, the district

2    attorney, that I did strike her more than once.

3    But that didn't happen.

4         **ATTORNEY NORTON:** So you've been totally

5    truthful and honest with the Panel here today.

6         **INMATE ABRON:** Yes, sir.

7         **ATTORNEY NORTON:** Thank you.  I have no

8    further questions.

9         **PRESIDING COMMISSIONER BIGGERS:** Okay.

10   I'm sort of confused.  You used drugs as a way to

11   get closer to your wife that had been abusive to

12   you?  Is that what I'm hearing?

13        **INMATE ABRON:** Yes, sir.  That's what

14   drugs do to you.

15        **PRESIDING COMMISSIONER BIGGERS:** Wait a

16   minute, now.  Prior to that time, prior to you

17   getting involved in drugs, in that seven-year

18   history, had your wife been physically or

19   mentally abusive to you?

20        **INMATE ABRON:** Yes, she was.

21        **PRESIDING COMMISSIONER BIGGERS:** Okay.

22   And then you decided -- and why do you think she

23   was that way to you?

24        **INMATE ABRON:** I guess because I stayed

25   and let her do that.  I allowed her to do that.

26   Yes, sir.

27        **PRESIDING COMMISSIONER BIGGERS:** Okay.

87

1  So then -- was she on drugs the whole time, those
2. seven years that you were talking about?
3          **INMATE ABRON:**  Well, she diddled and
4  daddled in it.  Yes, sir.
5          **PRESIDING COMMISSIONER BIGGERS:**  Diddled
6  and daddled.  Well, that can mean a little bit,
7  mediocre or whatever.  How much?
8          **INMATE ABRON:**  I would think a little bit
9  -- I would think a little bit.
10         **PRESIDING COMMISSIONER BIGGERS:**  And you
11  were not doing drugs at all at that time.
12         **INMATE ABRON:**  No, I was in the military.
13  I was subject to the test.
14         **PRESIDING COMMISSIONER BIGGERS:**  I
15  understand -- I understand what that means when
16  you say it.  I'm just asking you a question.  You
17  were not involved with that.
18         **INMATE ABRON:**  No.
19         **PRESIDING COMMISSIONER BIGGERS:**  But you
20  knew that she was.
21         **INMATE ABRON:**  Yes, sir.
22         **PRESIDING COMMISSIONER BIGGERS:**  Because
23  one of your stories that I read here was the fact
24  that you were upset with her because she asked
25  for money.  Is that right?
26         **INMATE ABRON:**  On that day.  Yes, sir.
27         **PRESIDING COMMISSIONER BIGGERS:**  On that

88

1 day. And that's what you think -- and you didn't
2 want to give her any money?

3 **INMATE ABRON:** No I wasn't, sir.

4 **PRESIDING COMMISSIONER BIGGERS:** Okay.
5 Although you were both involved with drugs during
6 that time.

7 **INMATE ABRON:** Prior to -- prior to that,
8 but not on that day. No, sir, not on that week.
9 No.

10 **PRESIDING COMMISSIONER BIGGERS:** Two days
11 before you said you had taken.

12 **INMATE ABRON:** Two days before that day
13 she didn't never come home, so that was -- my
14 friend stopped by and brought some drugs by.

15 **PRESIDING COMMISSIONER BIGGERS:** And you
16 took drugs that day. You didn't have to pay for
17 them?

18 **INMATE ABRON:** No.

19 **PRESIDING COMMISSIONER BIGGERS:** Okay.
20 All right. At this point I'm going to ask --
21 before I ask the district attorney if they are
22 going to close, may I ask Deputy Commissioner
23 Harmon, does he have any follow up questions.

24 **DEPUTY COMMISSIONER HARMON:** Nothing
25 further.

26 **PRESIDING COMMISSIONER BIGGERS:** Okay.
27 I'm going to ask the district attorney to please

89

1   close at this time, please.

2          **DEPUTY DISTRICT ATTORNEY TREVISAN:**   Thank

3   you.  Your Honor -- Commissioner, the district

4   attorney's office is very concerned based on the

5   nature of the crime specifically.  I'm mostly

6   going to address my comments to that.  From what

7   I've read in this file and what we have heard

8   today, I think there's a serious lack of insight

9   on behalf of the prisoner into his cause of this

10  horrific death.  One punch is not at all

11  consistent with the evidence in this case.

12  There's blood shown throughout the house.  There

13  is a knife wound to her head.  There's a bloody

14  knife in the bathroom.  The photographs that I

15  believe are a part of the file indicate severe,

16  multiple blunt force traumas.  It just not

17  consistent with what he's saying.  He is also

18  denying a history of domestic abuse, where

19  there's clear evidence that prior to his own

20  admitted beginning of drug use in 1990, prior to

21  that there's a history of domestic violence, and

22  that he was -- a report was made with respect to

23  a domestic violence incident that occurred in

24  Oakland.  That was in 1989, predating the drug

25  use, if any.  There's also the report that three

26  months prior to this, as reported to friends and

27  family members, the victim reported that the

1   defendant in fact did break her arm. And I
2   understand that he is denying that now. But the
3   family understood it. It was brought up at the
4   time of his trial. Her mother confronted him at
5   one point about it, and still brought him home.
6   And that's in the transcript of what she said at
7   the sentencing hearing. When she was addressing
8   the court at Mr. Abron's sentencing, she reminded
9   him of the time when they got back from the
10  hospital after he had broken her daughter's arm,
11  and how she told him at that time, 'don't hurt
12  her again.' And he said that he wouldn't. I
13  would also note that in the coroner's report --
14  also contradicts it in that the coroner's report
15  also indicates multiple police reports, that were
16  part of the San Francisco medical examiner's
17  records, of domestic violence. So we have not
18  only a minimization of the actual force used and
19  what happened on this life crime, but a complete
20  denial of a history of abusing this woman. And
21  without accepting responsibility and
22  understanding the nature of the crime, especially
23  the nature of domestic violence, I can't say that
24  there's been any progress whatsoever that would
25  prevent this man from being a serious threat to
26  any further intimate partners or even a casual
27  dating relationship. There's a clear lack of

91

1   insight and a clear minimization of the
2   seriousness of this offense. He's repeatedly
3   said he had no criminal behavior. He only hit
4   her one time. This is the only time. And blames
5   her an awful lot. In all of the statements that
6   are written, it's always she did something first.
7   She caused him to take drugs. She caused him to
8   get angry. She was cheating on him. She caused
9   him to hit her. And that is complete denial of
10  his responsibility. In the report it does also
11  indicate -- I just wanted to correct that -- that
12  the inspector noted that the phone lines had been
13  cut. And I think that would be particularly of
14  note in this case when looking at the underlying
15  facts of this case. Because she had just been
16  talking to a friend saying that she was telling
17  him to leave, and that she was going to leave,
18  and she'd call her in ten minutes. Immediately
19  after that is when this occurred. And the phone
20  lines had been cut. And there is a box cutter
21  found in that room. And that's indicated in the
22  documents, especially the inspector's. The
23  friend of the family also, Ms. Gaut, G-A-U-T,
24  indicates a history of domestic violence, which
25  is completely denied by this gentleman. I
26  understand that there were no letters from the
27  family in this hearing. They previously had

1  submitted letters.  The family members also did
2  talk at the sentencing hearing, and I think their
3  letters and the transcript is part of the file.
4  So I won't -- I'm sure you've read that.  But
5  they were very adamant, and this has caused them
6  a great deal of harm.  With respect to his
7  programming while in custody, I'm not really
8  going to address that, except that I think that
9  there's a lack of serious consideration of
10  domestic violence and anger management
11  counseling.  I understand that he's taken a
12  couple classes that might touch on that.  But
13  something really intensive that has to do with
14  the history of domestic violence, in order to
15  gain some insight as to what his long history of
16  abusing this woman has led to this event.  And
17  without that there's no possible way that he
18  wouldn't in the future be a serious threat to
19  another person.  The letter from the gentleman's
20  brother indicating that he would be willing to
21  give him a job and home for his parole plans is
22  concerning to me, because it indicates that he
23  believes that the prisoner no longer is in
24  denial.  And I just don't think that the records
25  show that.  I don't know if he's talking
26  differently when he is talking to his family; but
27  in what is presented here, he is clearly in

93

1   denial, both about his drug use, abuse, and
2   domestic violence. I think that's all I wanted
3   to address at this time.

4          **PRESIDING COMMISSIONER BIGGERS:** Okay.
5   Thank you very much. Mr. Norton?

6          **ATTORNEY NORTON:** Yes. Thank you. A
7   couple of things to -- kind of preliminary
8   comments. First of all, I disagree with the
9   district attorney's statement that there was a
10  knife wound to the head. I don't see it. I
11  absolutely do not see it in the record. I have
12  looked at the autopsy report. There is testimony
13  from the medical examiner, that again is in the
14  documents we presented today, and I'll just
15  briefly read it. It says, "in other words, is
16  not a sharp force like a knife. It is not a
17  bullet, and it is not fire. It is just force.
18  So all the injuries that are present about this
19  lady are blunt force trauma." Again, direct
20  testimony from the medical examiner. Again, I
21  know we always hear, 'we are not here to retry
22  the case,' okay? And I get the feel that that's
23  what we are doing. But I also understand the
24  Panel's concern that every inmate who comes
25  before them accepts responsibility for their
26  crime. And when I spoke with Mr. Abron about
27  this case, and he presented these documents to

94

1   me, I expressed that concern to him.  But I also
2   have to honor his rights and his desires to
3   address this Panel.  Because the last Panel had
4   serious doubts as to his credibility.  There's no
5   question.  I mean, we have all read the
6   transcript.  And there's just serious credibility
7   issues, for that Panel at least.  I believe that
8   Mr. Abron is not in denial.  I believe this was a
9   highly volatile relationship.  There's no
10  question about it.  It's uncontroverted that
11  there was drug use by both their parts.  I don't
12  believe that he has testified today that she
13  caused him to do this.  I think he -- contrary to
14  what's been said today, I think he shows
15  significant insight into the causative factors of
16  what led him to the drug use.  Again, it was a
17  way of trying to establish intimacy with his
18  wife.  After seven years, the marriage was
19  starting to grow apart.  Now, what's significant
20  is, we don't see any record of domestic violence
21  prior to this time, about 1990, when the drug use
22  did start.  I mean, it is void of that.  I don't
23  see any convictions prior to that time.  As far
24  as arrest reports, I didn't see an arrest report
25  from Oakland.  But I'll have to defer to counsel
26  on that.  So I think rather than being --
27  minimizing his involvement, I think Mr. Abron has

1    shown significant insight into the causative
2    factors.  Again, not blaming his wife for what
3    happened.  But it is -- there is no question, and
4    there's medical records from Mr. Abron, who was
5    hospitalized, I believe for up to two months
6    after his arrest because of the organophosphate
7    poisoning.  And again, he didn't submit these
8    records to the Panel today to try to mitigate or
9    minimize his role, but to explain what he -- at
10   his initial hearing three years ago, what he
11   talked about.  His version of what happened.  And
12   I appreciate the Commissioner's -- at first
13   glance it maybe looks like that's what he's
14   doing.  But again, this was for clarification.
15   Because his version has not changed.  It has
16   remained constant from the psych report of 2004
17   to the psych report of this year by Dr. Rouse, as
18   well as his version in the probation officer's
19   report.  Again, he has no reason to lie.  He has
20   done the time.  He's been incarcerated now for
21   13, 14 years.  There's absolutely no reason for
22   him to continue to lie.  The other thing I think
23   that's significant -- there were no enhancements
24   charged in this case.  This was a second-degree
25   murder.  There was no enhancement for a weapon,
26   there was no enhancement for domestic violence
27   and/or torture, which is certainly within the

96

1    discretion of the district attorney to charge at
2    the time of the charging. None of that is
3    evident, or is evident in this case. I think
4    that Mr. Abron has -- and I agree with Dr.
5    Rouse's comments -- that he has made the most
6    appropriate adjustments, that he expressed
7    genuine sense of remorse and seemed rather
8    contrite in relation to the effect his behavior
9    had on his wife and his marriage. I agree with
10   that. I think we saw that demonstrated today. I
11   would also note that Mr. Abron's GAF score from
12   his 2004 psych exam to the 2007 rose 20 points,
13   from a 70 to a 90. And I think that is certainly
14   reflective of his education and the significant
15   self help that he has engaged in over the last
16   three years. Dr. Rouse goes on to further state
17   that "Mr. Abron expresses what appears, again, to
18   be an appropriate amount of remorse and
19   contriteness." But then he does give the -- it's
20   interesting to me. He says:
21                "At least in the opinion of this
22           examiner, have limited insight and
23           understanding into the causative
24           factors that precipitated the
25           degree of rage and violence that he
26           committed upon his wife. And that
27           as a result, there's a high

1         reasonable probability that his
2         risk in the institution is low, but
3         relatively unpredictable in wider
4         society, especially as it relates
5         to his involvement in intimate
6         relationships."
7  And again, that's -- I think that's a legitimate
8  concern that the doctor expresses here.  And
9  Mr. Abron has testified today that he has no
10 interest in becoming involved in an intimate
11 relationship.  And it's pretty clear, again, from
12 his societal history, he has no prior assaultive
13 behavior, no criminal history of assaultive
14 behavior.  He has stable relationships, but for
15 this one marriage -- which again, for seven years
16 appeared to be fairly stable.  And again, was in
17 an intimate relationship, and one in which he
18 tried, albeit very very poor judgment on his
19 part, to try to re-engage or re-ignite that
20 intimacy with his wife.  So I understand the
21 doctor's concern about intimate relationships.
22 But I also think Mr. Abron has taken the
23 significant programs -- Anger Management, life
24 skills courses -- to deal with that.  And I think
25 that he -- and again, he has no absolutely no
26 115's while incarcerated.  None for violence,
27 none for -- so clearly he can obey the rules

1    within the institution. And I have no -- again,
2    formerly in the military. I have no doubt that
3    those gains can be maintained and realized in the
4    wider society. He certainly has upgraded
5    vocationally, with office services as well as the
6    other vocations that he claims to have in
7    refrigerating and heating from Avenal, landscape
8    horticulture, and shoe repair. He continues to
9    upgrade educationally with Coastline Community
10   College. He is 15 units short of another
11   associates of arts degree. The other thing I
12   wanted to talk about his insight is, you know, he
13   didn't call 911. And he testified today that he
14   was more concerned about himself than his wife.
15   However, I think it is significant that he did --
16   and again, at least apply her ice packs to put
17   about her wounds on her face. And again, this
18   crime was, I believe, a result of a significant
19   amount of strife -- excuse me, stress in his life
20   at the time of the commitment offense. Just
21   prior to this, he was involved in a serious burn
22   of his -- about 40 percent of his body. There is
23   evidence that he was -- well, not evidence. It's
24   uncontroverted by the court in the sentencing
25   that he was suffering from organophosphate
26   poisoning. And again, this went on for a couple
27   months, even after his arrest, being hospitalized

1  with such. I believe he has participated
2  significantly in AA and NA and worked the steps.
3  He did make a list of amends. He has sought to
4  reach out to the family through the appropriate
5  channels to express his remorse for the taking of
6  their family member. He has adequate parole
7  plans. He has a solid housing offer from his
8  brother, as well as a job offer, and there is
9  also great deliberation and well-thought-out
10  plans that he has put into days one through five
11  upon his release. I think he is to be commended
12  for the fact that he has really put some thought
13  and some effort into his parole plans. So what
14  we are left with, what the Panel is left with, is
15  the legal standard. Would Mr. Abron's release to
16  the community present an unreasonable risk of
17  danger to society or a threat to public safety?
18  Based upon his record while incarcerated -- and
19  again, the fact that he had, his prior -- no
20  juvenile record of assaulting others, significant
21  stable history -- I believe that there is no
22  evidence to support that his release to the wider
23  community would present an unreasonable risk of
24  danger to society or a threat to public safety,
25  and I believe that he should be due consideration
26  today for parole. With that I will submit.
27  Thank you.

1       **PRESIDING COMMISSIONER BIGGERS:**   Thank
2   you.   Now Mr. Abron, you have the right, the
3   opportunity, to give us a statement as to why you
4   feel you are suitable for parole, or you can rely
5   on what your attorney said, sir.

6       **INMATE ABRON:**   I'd like to make a
7   statement.

8       **PRESIDING COMMISSIONER BIGGERS:**   You can
9   make a statement.   A statement why you feel you
10   are suitable for parole, not to retry the case.

11       **INMATE ABRON:**   Yes.   I want to start off
12   by saying I am truly sorry for this crime and all
13   the pain and suffering that I caused her family
14   as well as my own.   I am thankful that I have
15   been able to make amends to my family, and I only
16   wish that I could do the same for her family.
17   There is not a day that goes by that I don't
18   think about DeLisa and this tragedy that I
19   caused.   And I only wish I could have been more
20   creative than violent in stopping this crime.   I
21   have matured over the last 13 years in dealing
22   with my feelings, and learning about humility has
23   been a great character builder for me.   However,
24   the question that is before us today is, would I
25   pose an unreasonable risk of danger to society,
26   or would I be a threat to public safety if I am
27   released from prison.   My gains have been ongoing

1  and continuous since I have arrived in CDCR.
2  Both my psychologist's and counselor's report
3  agree that I am sincerely remorseful.  My
4  violence potential in my assessment of
5  dangerousness if released into the community was
6  rated lower previously, even though I have
7  benefited from over 14 self-help programs since
8  my last hearing in 2004.  Because of my age, I
9  have also been assessed as a lower risk to
10  re-offend, with a prognosis that I would do very
11  well on parole.  I have remained disciplinary
12  free, and my behavior has continued to improve
13  daily through the knowledge obtained through the
14  various self-help programs that I have been
15  involved with.  These self-help groups have
16  enhanced my mental well being by obtaining over
17  1300 hours of group therapy sessions that I have
18  greatly benefited from.  I am very proud of my
19  vocational and educational gains; and in June,
20  after obtaining my associates degree, I will be
21  40 units shy of obtaining my bachelor's degree,
22  which I will begin in late June at Sacramento
23  State University.  If released, I have immediate
24  educational opportunities at Sacramento State, as
25  well as Project Rebound at San Francisco State
26  University, to help me continue my degree goals.
27  I have numerous employment opportunities through

1 our family business, county water treatment
2 facilities, sheet metal workers union, or at the
3 local refineries. In conclusion, I would like
4 this Panel to know that I indeed complied with
5 the Board of Prison Terms recommendations for my
6 2004 hearing, seeking more self help and
7 obtaining more -- both insight into the crime and
8 myself. I want to assure this Panel and know in
9 my heart that I would do very well on parole, and
10 once again become a productive member of this
11 community. I would like to thank this Panel for
12 any considerations you may afford me today. And
13 God bless you, and DeLisa's family as well.
14 Thank you for your time.

15          **PRESIDING COMMISSIONER BIGGERS:** We will
16 go into deliberations at this point. Thank you.
17                **R E C E S S**
18                   --oOo--

1     **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3         **PRESIDING COMMISSIONER BIGGERS:** Okay.

4     Thank you, sir.  In the matter of Mr. Kurt Abron,

5     A-B-R-O-N, CDC number K-82005, the panel has

6     reviewed all the information received from the

7     public and relied on the following circumstances

8     in concluding that the prisoner is not suitable

9     for parole and would pose an unreasonable risk of

10    danger to society or threat to public safety if

11    released from prison at this time.  The first

12    thing the Panel looked at, sir, was the

13    commitment offense itself.  This offense was

14    carried out in an especially brutal and vicious

15    manner.  Specifically, you murdered your wife,

16    Ms. Delia -- is that DeLisa?

17        **INMATE ABRON:** DeLisa.

18        **PRESIDING COMMISSIONER BIGGERS:** DeLisa

19    Abron, age 37, during what appeared to be an

20    altercation that took place in your home on the

21    night in question, which was June the 7th, 1994.

22    The offense also was carried out in a manner

23    which demonstrated exceptionally callous

24    disregard for human suffering, in that the

25    records reflect that the victim showed

26    indications of multiple blunt trauma injuries,

27    **KURT ABRON    K-82005  DECISION PAGE 1    4/19/2007**

1   which included black eyes, contusions, and
2   bleeding. The motive for this crime was very
3   trivial, in that from your own testimony, it
4   appeared that you were angry at the fact that
5   your wife had been unfaithful to you, and that
6   when you went over there to see her, some guy
7   knocked on the door or whatever, and that caused
8   you to become very angry. And again, that was
9   your testimony here today.

10        **INMATE ABRON:** That was from the prior
11   incident.

12        **PRESIDING COMMISSIONER BIGGERS:** These
13   conclusions are drawn from the statement of facts
14   from the probation officer's report, where it
15   said, according to the police report, on June the
16   7th, 1994, at 3:30 p.m., the officers went over
17   at the request of a Ms. Ruth Roberson, where she
18   indicated that he had found her tenant DeLisa's
19   bloody body in the home that you two had shared.
20   The victim's body was badly misshaped.
21   Ms. Roberson told the officers that the victim
22   did have a violent relationship with the inmate,
23   and that they were often involved in fights and
24   things were broken. Both resided at the
25   residence. And she also indicated that -- well,
26   the officers, when they found the victim, they
27   **KURT ABRON   K-82005   DECISION PAGE 2   4/19/2007**

1 discovered -- the body was found in the bedroom.
2 The bathroom and the hallway, there was blood.
3 The victim's head and face was covered in dry
4 blood and was blotted with ready pack ice packs
5 that were room temperature when the officers
6 arrived. The victim's face revealed multiple
7 blunt trauma injuries where she had black eyes,
8 confusions [sic], and bleeding. The medical
9 examiner determined that the victim died from
10 massive blunt trauma injuries to her face and
11 head. We note that you did have an escalating
12 pattern of criminal conduct, in that you were --
13 you had two previous records of domestic
14 violence, that you did have a tumultuous
15 relationship with the victim. The records
16 reflected that there were -- from witnesses that
17 you all had had some altercations prior to that
18 time. And also that you failed to -- you failed
19 previous grants of probation, which indicated
20 that you failed to profit from society's previous
21 attempts to correct your criminality, because you
22 were on probation for that one domestic violence
23 arrest. You have programmed exceptionally well.
24 I won't say exceptionally, but you have
25 programmed fairly well. You've -- we were not
26 able to find some information that we needed; but
27 **KURT ABRON    K-82005   DECISION PAGE 3    4/19/2007**

1  we went back to the previous Panel, and they did
2  have the fact that you were -- you did have
3  vocations in shoe repair and also in air
4  conditioning and heating. But we did find one
5  that's in office services, related technology.
6  But it goes back to show you -- and before going
7  any further, I told you before we even got
8  started that you need to review your central
9  file.

10         **INMATE ABRON:** Yes, sir.

11         **PRESIDING COMMISSIONER BIGGERS:** If you
12  have those completions in -- with you, you need
13  to sit down with your counselor to make sure that
14  those vocations, completions, are in fact in your
15  C file.

16         **INMATE ABRON:** Okay.

17         **PRESIDING COMMISSIONER BIGGERS:** Because
18  Deputy Commissioner Harmon went back a second
19  time and could not find them. We also want to --
20  you are moving, like I said, pretty well -- very
21  well in vocations. You also are upgrading
22  yourself educationally, in that you are attending
23  Coastline College. And you are working towards a
24  second AA degree. You have participated in quite
25  a bit of self help since your last hearing.
26  There was some Crimanon courses, Beat the Street
27  **KURT ABRON    K-82005  DECISION PAGE 4   4/19/2007**

1  recovery/rehab.  AA and NA, from January to
2  December of 2006.  Anger Management and Ethics
3  Decisions are those that I am -- that I have
4  noticed that are not part of the Crimanon system,
5  if you would.  You've only had nine 128(a)
6  chronos, the last one being January 23rd of '04.
7  And also, no serious 115's.  The psychological
8  evaluation dated February the 13th, 2007 by Dr.
9  Rouse, John T. Rouse, R-O-U-S-E, was not totally
10  supportive of release, in that he felt that you
11  would be unpredictable in the wider society.  And
12  I want to read that verbatim from his report. He
13  indicated that: "He expressed what appeared to
14  this examiner to be an appropriate amount of
15  remorse and contriteness for the life crime, but
16  seemed, at least in the opinion of this examiner,
17  to have some limited insight and understanding of
18  the causative factors that precipitated the
19  degree of rage and violence that he committed
20  upon his wife." And that's in the January --
21  February 13, 2007 report.  "As a result of that,
22  there's a high reasonable probability that the
23  inmate's risk of dangerousness in this
24  institutional setting is low, but is relatively
25  unpredictable in the wider society." In other
26  words, sir, from what I read is a little bit
27  **KURT ABRON   K-82005   DECISION PAGE 5   4/19/2007**

108

1 different from what your attorney read. And that
2 is that you need to really look and find out why
3 you went to that extremes with this crime. That
4 if you knew this was going on, and you in fact
5 went back and you said you started using drugs
6 and all that to try to salvage the relationship.
7 What made do you that? And when you found out
8 that it was still going on, why didn't you just
9 leave? And that if you get involved with anyone
10 else -- and you're saying, 'well, I don't have
11 any desire to do that, meet with any
12 relationship.' You're 51 years old, sir. You're
13 not dead. So therefore, there are going to be
14 some situations where you may eventually have a
15 relationship with someone.

16         **INMATE ABRON:** Sure.

17         **PRESIDING COMMISSIONER BIGGERS:** And if
18 that happens, you need to know what the causative
19 factors are, so that you won't -- when you are
20 released, then this will not occur again. On
21 your parole plans, they are adequate. But I
22 think you need to firm them up a little bit. We
23 feel that you need to firm them up. You have got
24 a viable place to live with your brother. You
25 talked about those halfway houses that you wanted
26 to go to. But again, they were not succinct. In
27 **KURT ABRON    K-82005   DECISION PAGE 6   4/19/2007**

1   other words, they were basically, we will let you
2   do -- one of them said, you know, 'we will give
3   them all the support that he can.' If it looked
4   better -- you would look better on this side of
5   the table when you say that, 'we have a bed for
6   him, it's going to be here for six months, three
7   months, two months,' et cetera. Not just, 'we
8   will do support for him.'

9          **INMATE ABRON:** Okay.

10         **PRESIDING COMMISSIONER BIGGERS:** The same
11  thing holds true -- now, your brother is going to
12  give you a job as an inspector assistant. Well,
13  you need to demonstrate to the Panel that you
14  have what it takes to do the job that they are
15  offering you. Not just, he is going to give you
16  a job and do this as entry level. What is going
17  to be your requirement? So that it won't be as
18  if somebody is just writing a letter to us
19  saying--

20         **INMATE ABRON:** I understand.

21         **PRESIDING COMMISSIONER BIGGERS:** -- I'm
22  giving this guy a job. He will be doing this, he
23  has the ability to do this, based on his degrees
24  or whatever --

25         **INMATE ABRON:** Okay.

26         **PRESIDING COMMISSIONER BIGGERS:** -- would
27  **KURT ABRON   K-82005  DECISION PAGE 7   4/19/2007**

110

1   be more appropriate.

2       **INMATE ABRON:**  Thank you.  Okay.

3       **PRESIDING COMMISSIONER BIGGERS:**  On the

4   3042 responses, we noted that the district

5   attorney of San Francisco County indicated an

6   opposition to a finding of parole suitability.

7   We also want to point out to you, sir, that --

8   your story.  There are some inconsistencies, and

9   that's why you need to go back and take a look at

10  the transcripts, the previous Panels.  And we

11  definitely want to thank you for bringing this

12  package in for us, because it helped us quite a

13  bit.  But I'd be a little careful as to what I

14  underlined and what I'm trying to emphasis.

15      **INMATE ABRON:**  Yes.

16      **PRESIDING COMMISSIONER BIGGERS:**  Because

17  when we went back and read this -- and I have to

18  agree with Deputy Commissioner Harmon -- you were

19  pointing to things that you wanted to draw your

20  attention to, which may have been in your

21  eyesight what you thought that the Panel was

22  talking about before.  But everything that we

23  went back there and saw, it was mitigating

24  circumstances as to, 'hey, this didn't happen the

25  way it was written.'  What we have to deal with

26  is what the court said happened.  And if you

27  **KURT ABRON    K-82005  DECISION PAGE 8   4/19/2007**

1  didn't appeal it, and if the appellate decision

2  -- or if it's not an appellate decision, we go

3  with the facts that we have here in your jacket.

4          **INMATE ABRON:**  Yes.

5          **PRESIDING COMMISSIONER BIGGERS:**  So when

6  you turn something like that in, just say 'okay,

7  this is what transpired.  This shows my remorse,'

8  et cetera, et cetera.  But don't try to draw our

9  attention to just some of the things that make

10 you look better than what you did when it comes

11 to the crime.  Because you already have been

12 convicted of that.

13         **INMATE ABRON:**  Yes.

14         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

15 Nevertheless, the Panel wants to commend you for

16 being disciplinary free.  No 115's.  When I say

17 'disciplinary free,' no 115's since your entire

18 incarceration.  You do have nine 128's, however.

19 That you -- and for the numerous Crimanon courses

20 that you have taken, to include Handling Drugs,

21 Successful Parenting course, Addictive Behavior,

22 Communications Tools, and AA and NA.  Also for

23 your good work reports that you received, and

24 also for upgrading yourself educationally,

25 because we tend to think that's very important.

26 However, these positive aspects of your behavior

27 **KURT ABRON   K-82005  DECISION PAGE 9  4/19/2007**

1   do not outweigh the factors of unsuitability. In
2   a separate decision, your hearing Panel found
3   that it's not reasonable to expect that parole
4   will be granted at a hearing within the following
5   two years. First and foremost, you committed
6   this offense in an especially cruel manner.
7   Specifically, you murdered your wife, Ms. DeLisa
8   Abron, on 6/7/94, after what appeared to be a
9   long-term physically abusive relationship. The
10   offense itself was carried out in a manner which
11   demonstrated an exceptionally callous disregard
12   for human suffering, in that after the attack,
13   that you agreed that took place, you left the
14   area by just putting those red [sic] packs and
15   leaving that for her without going to the extent
16   to find out what her injuries were. And you left
17   her there, and you went and got in your car and
18   you left the area. Your psychological report, as
19   I mentioned previously, February 13th, 2007,
20   indicated to this Panel that -- when he said that
21   your assessment of dangerousness is unpredictable
22   at this time in the wider society, it's an
23   indication to this Panel that a longer period of
24   observation and/or evaluation is required before
25   any Board can find you suitable for parole.
26   Before I get into some recommendations, Deputy
27   **KURT ABRON    K-82005    DECISION PAGE 10    4/19/2007**

113

1    Commissioner Harmon?

2         **DEPUTY COMMISSIONER HARMON:**   I think you
3    have covered it pretty well.   I'll return to the
4    chair.

5         **PRESIDING COMMISSIONER BIGGERS:**   All
6    right.   The Panel is going to recommend, sir,
7    that you remain disciplinary free.

8         **INMATE ABRON:**   Yes.

9         **PRESIDING COMMISSIONER BIGGERS:**   And that
10   includes no 128's.   That you continue to upgrade
11   yourself both educationally -- if you have all of
12   those vocations that you said that you have, make
13   sure that they get into your file.

14        **INMATE ABRON:**   Okay.

15        **PRESIDING COMMISSIONER BIGGERS:**   Because
16   I'm not going to sit up here -- we are not going
17   to sit up here and tell you to upgrade yourself
18   vocationally --

19        **INMATE ABRON:**   Okay.

20        **PRESIDING COMMISSIONER BIGGERS:**   -- when
21   you have those.

22        **INMATE ABRON:**   Yes.

23        **PRESIDING COMMISSIONER BIGGERS:**   But take
24   advantage of anything that comes available to
25   you.   Continue to participate in self help, and I
26   want to wish you luck.   Because you are moving in
27   **KURT ABRON    K-82005  DECISION PAGE 11   4/19/2007**

114

```
 1   a positive direction.

 2           INMATE ABRON:   Thank you.

 3           PRESIDING COMMISSIONER BIGGERS:   That

 4   concludes the hearing.   The time now is 11:35.

 5                 A D J O U R N M E N T

 6                      --o0o--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS
                                        AUG 1 8 2007
24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   KURT ABRON   K-82005  DECISION PAGE 12   4/19/2007
```

115

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, ROBERT DEVON BELL, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 114, and which recording was duly recorded at CALIFORNIA STATE PRISON, SOLANO, VACAVILLE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF KURT ABRON, CDC NO. K-82005, ON APRIL 19, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated June 17, 2007, at Davis, California.

ROBERT DEVON BELL TRANSCRIBER
**NORTHERN CALIFORNIA COURT REPORTERS**